STATE OF NORTH DAKOTA EX REL. WILLIAM LANGER, Attorney General, Petitioner, v. NORTHERN PACIFIC RAILWAY COMPANY, and Walker D. Hines, as Director General of Railroads of the United States, Defendants.

(172 N. W. 324 [reversed in 250 U. S. 135, 63 L. ed. 897, P.U.R.1919D, 705, 39 Sup. Ct. Rep. 502, 18 N. C. C. A. 878]).

Under the authority vested in him by Act of Congress of August 29, 1916, the President of the United States, on December 26, 1917, issued a proclamation assuming the possession and control of the railroad systems of the United

NOTE.—Authorities discussing the question of power of the President in time of war, to take possession and assume control of any system of transportation, are collated in notes in 4 A.L.R. 1680; 8 A.L.R. 969; 10 A.L.R. 956 and 11 A.L.R. 1450, on Federal control of public utilities

States. On March 21, 1918, an act of Congress was approved, which provided for the operation of the transportation systems then under government control and for just compensation to their owners. Acting under § 10 of that act, the Director General of Railroads promulgated general order No. 28, increasing freight rates horizontally and prescribing a uniform passenger fare of 3 cents per mile, not distinguishing between interstate and intrastate traffic. *Held:*

**Railroads — Federal control during war with Germany — extent of President's power.**

1. The Act of Congress of March 21, 1918, confers upon the President extraordinary executive powers rendered necessary by the existence of a state of war.

**Railroads — Federal control did not cease with signing of armistice.**

2. The termination of hostilities under the armistice does not justify judicial interference to restrain the further exercise of the extraordinary executive powers rendered necessary by the existence of a state of war.

**Railroads — President's power over interstate rates during Federal control.**

3. Section 10 of the Act of Congress of March 21, 1918, which gives to the President power to initiate rates, fares, charges, classifications, regulations, and practices, is construed in the light of the other provisions of the act and of the pre-existing method of regulating commerce through the agencies of Federal and state governments, and as so construed it does not confer original authority to initiate intrastate rates which will supersede pre-existing lawful rates, prescribed by the legislature or other competent state authority.

**Railroads — Federal control — review of rates by Interstate Commerce Commission.**

4. Rates initiated by the President or Director General, under § 10, are subject to review by the Interstate Commerce Commission, and its power to revise or alter is the power previously vested in it under the act to regulate interstate commerce, as amended, which gives it no authority to regulate intrastate rates as such.

**Railroads — review of rates by Interstate Commerce Commission.**

5. Under the Interstate Commerce Act as amended, the Interstate Commerce Commission has authority to modify intrastate rates otherwise valid only when the modification of such rates is necessary to the complete exercise of its jurisdiction over interstate commerce.

**Railroads — regulation of rates by state.**

6. In the absence of a clear expression of intention to repeal existing state regulations affecting intrastate commerce, it will not be presumed that Congress so intended.

**Railroads — Federal control — rates existing before Federal control in interstate police regulation.**

7. Under § 15 of the Act of March 21, 1918, which provides that nothing

in the act shall be construed to repeal, impair, or affect the existing lawful police regulations of the states except where such regulations may affect the transportation of troops, war materials, and government supplies, or the issue of stocks and bonds, pre-existing intrastate rates continue in effect as lawful police regulations.

**Railroads — police regulation.**

8. The term "police regulations" as used in § 15 is not limited to regulations directly affecting the health, lives, and morals of the people, but embraces regulations designed to prevent discrimination and economic oppression.

Opinion filed April 1, 1919.

Original proceeding in mandamus on relation of the Attorney General.

Peremptory writ awarded.

*Charles Donnelly,* Attorney for Director General, *M. A. Hildreth,* United States District Attorney for North Dakota, *John Carmody,* Assistant United States District Attorney for North Dakota, of counsel.

Congress was empowered by the Constitution to vest in the President, or in the Interstate Commerce Commission, control over intrastate rates and fares. Pappens v. United States, 252 Fed. 55; Minnesota Rate Cases, 230 U. S. 352, 399; Shreveport Case, 234 U. S. 342.

By the acts of August 29, 1916, and March 21, 1918, the President was given control over all traffic, state and interstate, and was empowered to initiate rates, fares, and charges by filing them with the Interstate Commerce Commission. Act of August 29, 1916; Act of March 21, 1918, §§ 9, 10; Employer's Liability Cases, 207 U. S. 463, 500; Trade-Mark Cases, 100 U. S. 82, 98; Beer Co. v. Massachusetts, 97 U. S. 25, 33.

Any doubt as to the meaning of the law will be resolved in favor of the executive's practical construction of it. Heath v. Wallᵃ¹, 138 U. S. 573, 582; Pennoyer v. McConnaughy, 140 U. S. 1, 23; Hahn v. United States, 107 U. S. 402; United States v. Moore, 95 U. S. 760.

*William Langer,* Attorney General (*Frank E. Packard* of counsel) for petitioner.

The right of action in the instant case arises under the Constitution and statutes of the state of North Dakota, and is not a Federal question. Tennessee v. Union Planters Bank, 152 U. S. 454; Chapple v. Waterworth, 155 U. S. 102; Walker v. Collins, 167 U. S. 57.

The decisions are assembled in Stanfield v. Umattlie River Water Users Asso. 152 Fed. 596.

Reasonable regulations to safeguard the resources upon which the nation depends for military success must be regarded as being within the powers confided to Congress to enable it to prosecute a successful Navy. McCullough v. Maryland, 4 Wheat. 316–421; Miller v. United States, 11 Wall. 268; Steward v. Kahn, 78 U. S. 493–507; Mayfield v. Richards, 115 U. S. 137.

The boundary line of state and Federal power has been clearly marked out by the Supreme Court in such leading decisions as the Minnesota Rate Cases, 230 U. S. 352, the Shreveport Cases (Houston & T. R. Co. v. United States, 234 U. S. 342).

BIRDZELL, J. On the application of the above-named plaintiff an alternative writ of mandamus issued out of this court, commanding the defendants to desist from collecting any fares, rates, or charges for carrying passengers, freight, and baggage between points wholly within the state of North Dakota, other than those stated in the schedules on file in the office of the board of railroad commissioners of the state; or that they show cause why they have not done so. The foregoing writ issued in accordance with the prayer of a complaint and petition, alleging, among other things not material to be noticed, that, by virtue of an Act of Congress of August 29, 1916, the President of the United States issued a proclamation on December 26, 1917, following which he assumed possession and control of the railroad systems of the United States, and that he has been in such possession since January 1, 1918; that on May 25, 1918, William G. McAdoo, predecessor in office of the defendant Walker D. Hines, as Director General of Railroads of the United States, issued general order No. 28, whereby he directed the railroads, under his control, to put into force and effect on June 10, 1918, certain passenger fares and baggage charges, and on June 25, 1918, certain freight rates, which fares, charges, and rates were in excess of those previously authorized to be collected on the intrastate commerce of the defendant company within the state of North Dakota.

Separate answers were filed by the railroad company and by the said Hines, as Director General. The answer of the railroad company alleges that from December 28, 1917, until on or about August 1, 1918, the

Director General exercised possession and control of its transportation system through the officers and agents of the defendant company; but that since August 1, 1918, such possession and control have been exercised through various agents appointed by the Director General. Denying that the defendant company has any power or authority over the tariffs complained of, it asks that the action be dismissed as to it.

The answer of the Director General sets forth the legal basis relied upon to support general order No. 28, and asks that the alternative writ be quashed.

Counsel for the Director General, at the outset of the argument, expressly state that no question relating to the jurisdiction of the court is raised; that jurisdiction is conceded, and that the question before the court is one of the power of the Director General under the Rail Control Act. Consequently it is unnecessary for us to consider what the authority of the Director General may be outside the act.

There is, then, but a single question involved in this proceeding, and that is the validity of general order No. 28 as applied to rates, fares, and charges for the intrastate commerce. The effect of the order, if valid, is admitted. It fulfils the intention therein expressed to increase freight rates upon all business, both interstate and intrastate, 25 per cent, and to establish passenger fares on the basis of 3 cents per mile for both interstate and intrastate carriage (except that where the intrastate rate of fare may exceed 3 cents per mile it is not reduced), and changes are also effected in charges for excess baggage, which purport to be applicable to both interstate and intrastate commerce.

The validity of the order depends upon the construction of § 10 of the Act of March 21, 1918, which is entitled "An Act to Provide for the Operation of Transportation Systems While under Federal Control, for the Just Compensation of Their Owners and for Other Purposes." The section which is relied upon as containing the authority to promulgate the order in question is as follows:

"Section 10. That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and

judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government. Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control, or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control.

*"That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the Commission pending final determination.*

"Said rates, fares, charges, classifications, regulations, and practices shall be reasonable and just and shall take effect at such time and upon such notice as he may direct, but the Interstate Commerce Commission shall, upon complaint, enter upon a hearing concerning the justness and reasonableness of so much of any order of the President as establishes or changes any rate, fare, charge, classification, regulation, or practice of any carrier under Federal control, and may consider all the facts and circumstances existing at the time of the making of the same. In determining any question concerning any such rates, fares, charges, classifications, regulations, or practices or changes therein, the Interstate Commerce Commission shall give due consideration to the fact that the transportation systems are being operated under a unified and co-ordinated national control and not in competition.

"After full hearing the Commission may make such findings and orders as are authorized by the act to regulate commerce as amended, and said findings and orders shall be enforced as provided in said act: Provided, however, That when the President shall find and certify to the Interstate Commerce Commission that in order to defray the expenses of Federal control and operation fairly chargeable to railway operating

43 N. D.—36.

expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, the Interstate Commerce Commission in determining the justness and reasonableness of any rate, fare, charge, classification, regulations, or practice shall take into consideration said finding and certificate by the President, together with such recommendations as he may make." [40 Stat. at L. 456, chap. 25, Comp. Stat. § 3115¾ j, Fed. Stat. Anno. Supp. 1918, p. 762.]

Before entering upon the discussion of the meaning of the above section, we should note the fact that possession and control of the railroads had been assumed by the President, acting under the authority of an Act of Congress of August 29, 1916, which provided that the President in time of war was "empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." [39 Stat. at L. 645, chap. 418, Comp. Stat. § 1974a, 9 Fed. Stat. Anno. 2d ed. p. 1095.] The act, of which § 10 first above quoted is a portion, was adopted after Federal control was an established fact. It should be stated, too, that the finding and certificate referred to in the proviso of § 10 above were made and filed with the Interstate Commerce Commission.

The contention of the plaintiff is that the authority to "initiate rates, fares, charges, etc.," is only applicable to interstate commerce, and in support of this contention, arguments are advanced which are drawn from the history of the Federal regulation of commerce, as well as from other sections of the act in question, considered in connection with the act to regulate interstate and foreign commerce, as amended. It is also argued that the order is void on the ground that it is not apparent that the act giving such plenary power to the President was adopted for the purpose of enabling him to exercise the broad executive functions rendered necessary by the existence of a state of war. And, further, that, if such powers are justified only as war powers, the justification ceased upon the signing of the armistice. It is recalled that immediately fol-

lowing this event the President announced to Congress, "The war thus comes to an end; for, having accepted these terms of armistice, it will be impossible for the German command to renew it." We feel that the latter contention may be briefly disposed of by referring to § 10 of the act. It provides for the initiation of rates by the President "whenever, in his opinion, the public interest requires." The vesting of such a power in the Executive is so patently obnoxious to the competent method of rate regulation under normal conditions, that it is not to be assumed Congress would have vested the power in such terms except as a means of facilitating the extraordinary executive functions which are conferred upon the President in times of war. The power to regulate rates is legislative, and rates are initiated either by the carriers themselves, by legislation, or by a tribunal or agency upon which the legislature has imposed the duty.

It was not until the Act of June 18, 1910, that the power to prescribe a rate applicable to interstate commerce was vested in the Interstate Commerce Commission. Prior thereto, under § 15 of the Hepburn Act of June 29, 1906, the Interstate Commerce Commission had power to declare given rates unjust or unreasonable; but it was held by the United States Supreme Court, in Interstate Commerce Commission v. Cincinnati, N. O. & T. R. Co. 167 U. S. 479, 42 L. ed. 243, 17 Sup. Ct. Rep. 896, that the power to declare certain rates charged by the carrier to be unreasonable and unjust did not include the power to prescribe or fix rates, and, as this power was legislative in character, it could not be held to be vested in the Interstate Commerce Commission by implication. Later, however, when the Act of 1910 vested in the Commission power to prescribe and fix rates, the court held, in Interstate Commerce Commission v. Louisville & N. R. Co. 227 U. S. 88, 57 L. ed. 431, 33 Sup. Ct. Rep. 185, that the statute which, in reality, delegated the legislative function to the Interstate Commerce Commission, was valid; but it was held to be valid because it provided for due process of law in such matters. The court said: "But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. *A finding without evidence is arbitrary and baseless.* And if the government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative

body, or tribunal, under our government. It would mean that, where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however, beneficently exercised in one case, could be injuriously exerted in another, is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power."

The above language is, of course, as applicable to any attempt to confer upon the President a power to prescribe, without a hearing, rates which cannot be suspended pending a final determination by another tribunal as to any attempt to vest a similar power in a commission. The fact that Congress originally authorized the possession and control to be taken in the event of war, coupled with the fact that it expressly made applicable a rate-making procedure which would be clearly unconstitutional in times of peace, is satisfactory evidence that the possession and control of the railroads by the President is purely a war measure. As a war measure, the government necessarily assumes its constitutional obligation to make compensation. See United States v. Russell, 13 Wall. 623, 20 L. ed. 474. And the burden of administration was placed where it would be free from possibility of conflict with the constitutional authority to command the armies and Navy, hence it devolved primarily upon the Chief Executive.

The foregoing observations would not be strictly applicable to the fixing of rates for a service that is supplied by the government itself through its own agency or instrumentality. But we do not find in the act in question any evidence that Congress intended to treat the transportation systems as belonging to the government. It rather appears that they are to be utilized primarily for war purposes, while at the same time their ordinary uses are to continue as far as possible. It is provided, for instance, that suits may be maintained against the carriers; that the rates, fares, and charges are to be measured by an existing standard of reasonableness, which is to be finally determined and applied by an authority other than the President, and that the property is to remain subject to the taxing power of the states. These and other provisions sufficiently indicate the intention to continue the pre-existing legal relationship between the carriers on the one hand, and the public on the other, that we ought not to presume, in the absence of some

definite expression, a purpose to discontinue the ordinary standards and means for determining the rights of patrons. Except to the extent that these standards and means are subordinated to the needs of the government in handling the problem before it, they still exist.

Neither can we construe the military exigency which gave rise to the necessity for the government taking possession of the transportation facilities to have terminated. The act itself fixes the period of control as one which shall continue during the war "and for a reasonable time thereafter, which shall not exceed one year and nine months first following the date of the proclamation by the President of the exchange of the ratifications of the treaty of peace." So, even though hostilities may have ceased, it is apparent that the time has not arrived for the mandatory termination of government control under the act of Congress, or for the enforced rescission of orders thereunder, originally justified, as meeting war emergencies. A reading of the legislation upon the subject of transportation in its relation to the national defense discloses that there are many interests affected, both of the government, of the carriers, and of the public, which are sought to be safeguarded through the employment of appropriate means to that end by the executive department. The variety and extent of these interests suggest numerous intricate problems to be solved by the legislative and executive departments. For these reasons it is apparent to us that the termination of Federal control cannot be judicially fixed at any other time than that prescribed by Congress.

The case then resolves to a mere question of statutory construction, and in arriving at the meaning of the act the various provisions must be read so that all may be given effect without inconsistency (New Lamp Chimney Co. v. Ansomia Brass & Copper Co. 91 U. S. 656–661, 23 L. ed. 336–338), and particular words must not be selected or given an effect that will "virtually destroy the meaning of the entire context" or "give them a significance which would be clearly repugnant to the statute, looked at as a whole, and destructive as of its obvious intent." Van Duke v. Cordova Copper Co. 234 U. S. 188–191, 58 L. ed. 1273–1274, 34 Sup. Ct. Rep. 884. It is important that every provision of the act shall be regarded, and that it shall be so construed as to give effect to its spirit and paramount purpose. In so construing the law, it is proper not only to consider the language found within its four corners,

but to look as well to the history of the subject-matter involved, in an effect to harmonize, if possible, any provisions that are apparently conflicting.

It is true, as asserted by counsel for the petitioner, that Congress, prior to the enactment of the legislation in question, had never undertaken to regulate commerce carried on within a state. Section 1 of the Interstate Commerce Act expressly provides that it "shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state, and not shipped to or from a foreign country from or to any state or territory as aforesaid." [24 Stat. at L. 379, chap. 104, Comp. Stat. § 8563, 4 Fed. Stat. Anno. 2d ed. p. 337.] Since this act, as amended from time to time, gives to the Interstate Commerce Commission all the regulatory authority it possesses (unless the Federal Control Act enlarges it), it is clear that it has not been authorized to regulate, directly and primarily, intrastate commerce. It will readily be conceded that Congress possesses ample power to regulate intrastate commerce to the extent necessary to make effective its power to regulate interstate commerce. Shreveport Case (Houston, E. & W. T. R. Co. v. United States) 234 U. S. 342, 58 L. ed. 1341, 34 Sup. Ct. Rep. 833; American Exp. Co. v. South Dakota, 244 U. S. 617, 61 L. ed. 1352, P.U.R.1917F, 45, 37 Sup. Ct. Rep. 656; but it is important to keep in mind the limitations. In the absence of clearly expressed legislative intention it will not be presumed that the power to regulate interstate commerce has been so vested in Federal authorities as to nullify every state regulation that only indirectly or remotely affects interstate business. Reagan v. Mercantile Trust Co. 154 U. S. 413, 38 L. ed. 1028, 4 Inters. Com. Rep. 575, 14 Sup. Ct. Rep. 1060; Minnesota Rate Cases (Simpson v. Shepard) 230 U. S. 352, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916A, 18.

Neither are we inclined to question the power of Congress, in providing for Federal control of transportation during a war emergency, to vest in the President the full administrative power necessary to effectuate such a degree of unified control as would be independent in every respect of existing state regulations or of all state regulating authority. We are only concerned here with ascertaining whether or not *Congress has* vested powers in the President which may properly be

exercised independently of all state regulations affecting intrastate rates. It would seem that, if it were intended to invest the President with the broadest range of authority, language would have been employed which would be wholly adequate to manifest that intent. As was said by Mr. Justice Brewer in the case of Reagan v. Mercantile Trust Co. supra, page 416, in interpreting an act under which a railroad corporation was organized: "There is in the act creating this company nothing which indicates an intent on the part of Congress to so remove it [i. e., from state regulation], and there is nothing in the enforcement by the state of reasonable rates for transportation wholly within the state which will disable the corporation from discharging all the duties and exercising all the powers conferred by Congress. By the act of incorporation, Congress authorized the company to build its road through the state of Texas. It knew that, when constructed, a part of its business would be the carrying of persons and property from points within the state to other points also within the state, and that in so doing it would be engaged in a business, control of which is nowhere by the Federal Constitution given to Congress. It must have been known that, in the nature of things, the control of that business would be exercised by the state, *and if it deemed that the interests of the nation and the discharge of the duties required on behalf of the nation from this corporation demanded exemption in all things from state control, it would unquestionably have expressed such intention in language whose meaning would be clear.* Its silence in this respect is satisfactory assurance that, in so far as this corporation should engage in business wholly within the state, it intended that it should be subjected to the ordinary control exercised by the state over such business. Without, therefore, relying at all upon any acceptance by the railroad corporation of the legislature of the state, passed in 1873 in respect to it, we are of opinion that the Texas & Pacific Railway Company is, as to business done wholly within the state, subject to the control of the state in all matters of taxation, rates, and other police regulations."

Another expression opposed to the implying of restrictions on the power of the states to regulate intrastate commerce is that of Mr. Justice Hughes, in the Minnesota Rate Cases (Simpson v. Shepard) supra, page 417: "If this authority of the state be restricted, it must be by virtue of the paramount power of Congress over interstate commerce

and its instruments; and, in view of the nature of the subject, a limitation may not be implied because of a dormant Federal power; that is, one which has not been exerted, but can only be found in the actual exercise of Federal control in such measure as to exclude this action by the state which otherwise would clearly be within its province."

The argument that the intrastate commerce rates prescribed by the Minnesota statutes were invalid because operating prejudicially upon interstate rates was met by the following considerations, page 420:

"Having regard to the terms of the Federal statutes, the familiar range of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, and the decisions of this court, recognizing and upholding this authority, we find no foundation for the proposition that the act to regulate commerce contemplated interference therewith.

. "Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable, or to invest its administrative agency with authority to determine their reasonableness. Neither by the original act nor by its amendment did Congress seek to establish a unified control over interstate and intrastate rates; it did not set up a standard for interstate rates, or prescribe, or authorize the Commission to prescribe, either maximum or minimum rates for intrastate traffic. It cannot be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempted to override the accustomed authority of the states without the provision of a substitute. On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found; that is, with the states and the agencies created by the states to deal with that subject."

The terse statement of Mr. Justice Harlan, in delivering the opinion of the court in the case of Reid v. Colorado, 187 U. S. 137–148, 47 L. ed. 108–114, 23 Sup. Ct. Rep. 92, 12 Am. Crim. Rep. 506, supports the rule of construction for acts of Congress which we deem to be proper when the subject-matter vitally affects the principal power of a state, and one which must give way to the paramount power of the Federal government only when Congress deems it wise to intervene. The statement is: "It should never be held that Congress intends to supersede, or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested."

Since the only portion of the act in question which may be said to vest in the President the authority contended for is that portion of § 10 giving him power to initiate rates, fares, charges, etc., it remains to be seen whether, when read in connection with its context and with other sections of the act in the light of the pre-existing scheme, according to which commerce was regulated by the Federal and state governments, Congress has clearly manifested its desire to authorize what has been done. Standing alone, the expression of authority to initiate rates would clearly be broad enough to cover both interstate and intrastate commerce. We are of the opinion, too, that this broad language was entirely appropriate. The power to "initiate" a rate is one that has always been exercised by the carriers, and with the assumption of Federal control it was essential that the full power be placed in a Federal agency. This is a sufficient reason for vesting the power in unrestricted terms. But the crucial question is whether or not limitations upon its future exercise are not prescribed in the act.

The same section provides for an appeal to the Interstate Commerce Commission, and authorizes that body to set aside or modify any rate, fare, charge, etc., that may be found to be unjust or unreasonable. In making its findings, the authority of this body must be sought in the act to regulate commerce as amended, since it is expressly remitted to that act for authority to make its findings and enforce its orders. It is clearly the intent of § 10, construed as a whole, to give to the Interstate Commerce Commission an authority to review that is coextensive with the authority of the President to initiate. It is doubtless also intended to require that all rates, fares, charges, etc., initiated under the act shall be just and reasonable in the light of the circumstances, taking into consideration the necessity for increased operating revenue. It follows from this that, if increased powers, extending to existing lawful intrastate rates, are given to the Interstate Commerce Commission, they are given in the Federal Control Act, and it is not at all clear that such was intended. To give to the control act the construction necessary to support the contention made is equivalent to amending by implication the Interstate Commerce Act so as to extend its scope to matters which were never before embraced within it. Indeed, it is tantamount to repealing the express provision that it shall not operate as to transportation wholly within a state. This might well have been the intention as to

matters not previously covered by state regulations; but it is another matter entirely to ascribe such an intention as to a field of regulation already occupied.

That it was not intended to entirely supplant pre-existing regulations of the states seems to us to be even more clearly demonstrated by § 15. The section is as follows:

"Section 15. Nothing in this act shall be construed to amend, repeal, impair or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds." [40 Stat. at L. 458, chap. 25, Comp. Stat. § 3115¾o, Fed. Stat. Anno. Supp. 1918, p. 765.]

The foregoing section lays down a rule of construction for the entire act, according to which it shall not be held to amend, repeal, or impair or affect existing lawful police regulations of the several states, except wherein such regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds. The query arising from this section is, Does the expression "lawful police regulations" include existing regulations with respect to intrastate rates, fares, and charges? It is contended on behalf of the Director General that such regulations are not included, because, it is stated, the regulation of rates is not an exercise of the police power of the state. In support of this contention, it is argued that the police power, in the exercise of which lawful police regulations are made, is one which exists for the general welfare of society, and is, therefore, one which cannot be bargained away. Attention is called to the fact that the regulation of rates is frequently accomplished, to a degree at least, by the exercise of the power to contract. We fail to perceive the force of the argument that would remove rate regulations from the category of the lawful police regulations of the state on account of the practical necessity which has rendered necessary the recognition of contract obligations originating in franchises. Never since Lord Hale gave expression in his De Portibus Maris, to the principle according to which public callings are subject to regulation, has there been any doubt of the right or the power of the state to regulate charges. In fact, it was the exaction of "arbitrary and excessive duties for cranage, wharfage, etc.," that led to the exercise of

the power of control which was vindicated in the statement referred to. See 2 Hargrave, Law Tracts, 78. That this power is a part of the state's police power is hardly open to question, since the decision in Munn v. Illinois, 94 U. S. 113, 24 L. ed. 77. In that case, Chief Justice Waite, delivering the opinion of the court, quoted the definition of the police powers as framed by Chief Justice Taney in the License Cases, 5 How. 583, 12 L. ed. 292, in which he referred to them as "nothing more nor less than the powers of government inherent in every sovereignty . . .; that is to say, . . . the power to govern men and 'things." They were said to be powers which sprung from adherence to the maxim, "sic uteri tuo ut alienum non laedas." It is the purpose of all rate regulations to preserve the common right to the service rendered in a public calling at a reasonable cost. Fundamentally this is as much a matter of police regulation as are regulations designed to protect health and safety or to prevent discrimination. It matters little whether, in considering specific arrangements looking toward the security of the rights of the public in relation to common carriers, it may become necessary to recognize contractual arrangements made by a legislative body as a practical expedient; the power to regulate the rate is in its essence police, and the exercise of the power results in a "police regulation."

In the case of Reagan v. Mercantile Trust Co. 154 U. S. 413, 38 L. ed. 1028, 4 Inters. Com. Rep. 575, 14 Sup. Ct. Rep. 1060, supra, it will be noted that the United States Supreme Court expressly characterized state regulations of rates as "police regulations" in the following expression: "We are of the opinion that the Texas & Pacific Railway Company is, as to business done wholly within the state, subject to the control of the state in all matters of taxation, rates, and other police regulations."

But, it is contended that the term "police regulations" appearing in the statute is one which may be used either in a limited sense or in a very comprehensive sense, and that in the statute in question it is used in its "ordinary accepted sense" as referring to the exercise of the power to protect the health, lives, and morals of the people (Manigault v. Springs, 199 U. S. 473–481, 50 L. ed. 274–279, 26 Sup. Ct. Rep. 127), rather than in the broader acceptation, which, in reality, embraces everything essential to "the great public needs." Noble State Bank v.

Haskell, 219 U. S. 104–111, 55 L. ed. 112–116, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487; Barbier v. Connolly, 113 U. S. 27, 28 L. ed. 923, 5 Sup. Ct. Rep. 357. In substance, the contention is that the particular sense in which the term is used in a given place must be gathered from the context. We find nothing in the act, however, which, in our opinion, makes it necessary in executing its various provisions to distinguish between those police regulations that affect the health, lives, and morals of the people, and those that protect their convenience and economic welfare.

The argument that the reservation of "lawful police regulations," rather than the police *power*, shows a purpose to limit the scope of the meaning, is well met by a comparison with the reservation of the taxing power in the same section. The section preserves in full, not only the existing laws of the states relative to taxation, but it preserves as well, unimpaired, the *power* to tax. See Congressional Record, vol. 56, part 4, p. 3313. So, the states may pass such future legislation upon the subject of taxation as would be constitutional if the roads were in private hands; provided, of course, it does not interfere with the transportation of troops, war materials, and government supplies. The roads are not declared to be in public ownership, and the power to tax is as broad as the similar power over roads incorporated by act of Congress (Union P. R. Co. v. Peniston, 18 Wall. 5, 21 L. ed. 787; see also Congressional Record, supra), or as conceded by act of Congress in the case of national banks. On the other hand, with regard to the *police power* generally, it is not to be exerted anew, or in a different measure or manner during Federal control from that existing before. The act only continues in force the *existing* police regulations, and the railroad administration is not bound to respect any additional police regulations. Centralization of administrative authority free from future interruptions was accomplished, but Congress accepted the *status quo ante,* so far as police regulations were concerned; and it authorized them to be ignored only when necessary to secure military efficiency in the matter of the transportation of troops, war materials, and government supplies.

The suggestion that a rate prescribed by statute, from which a carrier is prohibited from departing under penalty, is not a police regulation concerning the carriage of intrastate commerce, seems to us also, as hereinabove indicated, to ignore the fundamental considerations that deter-

mine the validity of such regulations. In Reagan v. Farmers' Loan & T. Co. 154 U. S. 362, 38 L. ed. 1014, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047, it was said: "There can be no doubt of their power and duty [of the courts] to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation."

To a similar effect are Covington & L. Turnp. Road Co. v. Sandford, 164 U. S. 578, 41 L. ed. 560, 17 Sup. Ct. Rep. 198, and Lake Shore & M. S. R. Co. v. Smith, 173 U. S. 684, 43 L. ed. 858, 19 Sup. Ct. Rep. 565; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1011, L.R.A.1915C, 1189, 34 Sup. Ct. Rep. 612. Rates are regulated because the business is affected with a public interest. Every regulation must be measured by the yardstick of reasonableness, and must fall short of prohibition, destruction, or confiscation in order to be valid. Freund, Pol. Power, § 63. Nothing, it seems to us, falls more properly within the domain of police regulations than rules prescribed as a means of preventing economic oppression and securing equality of right to the service in a public calling. See Freund, Pol. Power, § 378.

A strong indication that the term "police regulations" was used in a much broader sense than that contended for is the fact that, in making exceptions to the regulations that should continue in force, Congress saw fit to expressly except regulations affecting the issuance of stock and bonds. It will be noted that § 7 gives to the President, in unambiguous terms, the right to control the issuance of securities during the period of Federal operation. Yet it was thought necessary in § 15 to expressly except from the police regulations of the states which were to continue in force those affecting the issuance of stocks and bonds. Clearly these regulations are of a character that would not directly affect the public health, safety, or morals. They are as much designed to protect the economic welfare of society as are those relating to rates, and there would have been no occasion to make the exception had the term "police regulations" been used in the sense contended for. (A statute of this character was involved in a recent case,—Union P. R. Co. v. Public Service Commission, 248 U. S. 67, 63 L. ed. 131, P.U.R.1919B, 315, 39 Sup. Ct. Rep. 24.)

The Congressional history of the act in question, appended hereto, in

our judgment, amply supports this construction. When the bill original-
ly passed the Senate it provided only for the continuation of the states'
powers to tax. It was amended, however, in the House, by the addition
of the following clause: "Or the lawful police regulations of the several
states, except wherein these regulations may affect the transportation of
troops, war materials, or government supplies, *the regulation of rates,
the expenditure of revenues, the addition or improvement of properties*
or the issue of stocks and bonds. Congressional Record, vol. 56, part 3,
p. 2820.

The foregoing clause, after being tacked on the provision "that noth-
ing in this act shall be construed to amend, repeal, impair, or affect the
existing laws or powers of the states in relation to taxation," as previous-
ly contained in the bill, was transferred to the end and became a new
section—now § 15. The conference committee later, reporting to the
House and Senate, struck from the exceptions to the proviso above those
exceptions which are italicized. This is a matter of some significance
in determining the sense in which the term "police regulations" is used.
If the exception of "the regulation of rates" previously inserted had been
allowed to stand, it is clear that every existing state regulation affecting
rates would have been rendered nugatory upon the promulgation of an
order by the Director General superseding such rates, whether or not the
transportation of troops, war materials, or government supplies was
affected, and the power would have existed just as it is contended for in
this case. The striking of that clause, however, from the exceptions,
indicates an intention to preserve existing state regulations affecting
rates, except in so far as the transportation of troops, war materials, and
government supplies may be affected. To this must also be added, we
believe, the power to prevent existing intrastate rates from operating in
such a way as to result in unlawful discriminations on account of such
regulations as it may be found necessary to promulgate in operating the
roads as a unit.

As hereinbefore stated, the Federal government is supreme in the do-
main of interstate commerce, and there is nothing in this act to indicate
that the regulatory power, as it previously existed, was intended to be
modified in the slightest degree by existing state regulations. All the
powers possessed by the Interstate Commerce Commission are to con-
tinue except the power to suspend rates.

In the case of Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 58 L. ed. 1341, 34 Sup. Ct. Rep. 833, supra, the Supreme Court of the United States held that under § 3 of the original Act to Regulate Commerce, February 4, 1887 (see chap. 104, 24 Stat. at L. 379, 380, Comp. Stat. § 8563, 4 Fed. Stat. Anno. 2d ed. p. 337). Congress, having prescribed discriminatory rates and practices, the Commission had authority to correct unjust discriminations even though, in so doing, it became necessary to alter pre-existing rates on intrastate commerce. Thus, under the power previously possessed by the Commission, under the Act to Regulate Commerce, it would have full power to alter any intrastate rate that might result in an unlawful discrimination by reason of the initiation of a new interstate rate by executive authority, or that may result from a valid routing order. To the same effect is the recent case of American Exp. Co. v. South Dakota, 244 U. S. 617, 61 L. ed. 1352, P.U.R.1917F, 45, 37 Sup. Ct. Rep. 656, supra.

The order in the instant case, as it relates to intrastate commerce, does not purport to have been promulgated for the purpose of obviating discriminations. On the contrary, a portion of the order, at least,— that which relates to intrastate passenger fares,—cannot possibly be justified on any such basis, as a simple illustration will suffice to demonstrate. Prima facie, it creates discriminations by disturbing the balance of pre-existing fares that were just and reasonable. Prior to the order in question intrastate tickets were sold to and from all points within Minnesota at 2 cents per mile; from and to all points within North Dakota at $2\frac{1}{2}$ cents per mile; and from and to all points in Montana at 3 cents per mile, and the interstate fares were based upon the local rates. These intrastate fares were all presumptively legal and had been in operation for some time. Such differences as existed were readily accounted for by differences in cost of constructing roads in the various states, density of traffic, etc. Yet the necessity demanding increased revenues from the purely intrastate business was not recognized in the order as being general. The burden is not distributed by percentage increases that will affect all localities alike; but the patrons in one state are required to pay 50 per cent above the previous lawful and reasonable fare, in another, 20 per cent above, and in the other, no additional charge is imposed. This is a sufficient demonstration that a portion of the order at least is not to be justified as a means of preventing discrimi-

nation; so it would not fall within any regulatory power previously exercised by the Federal government or possessed by the Interstate Commerce Commission.

In considering the character of order No. 28 in its direct effects upon interstate commerce, it is also proper to note that all rates initiated are to be measured upon review by the Interstate Commerce Commission according to the "expenses of Federal control and operation *fairly chargeable to railway operating expenses,*" and to pay certain fixed charges. This is not a blanket authority to increase rates, but a limitation. Its true character is perhaps best understood by referring to the very substantial appropriation of $500,000,000 to be used as a revolving fund, and to the then recent fact of the denial by the Interstate Commerce Commission of an application for a general increase of 15 per cent in interstate freight rates. Fifteen Per Cent Case, 45 Inters. Com. Rep. 303. These facts, together with the further well-known fact that by far the larger percentage of earnings is from interstate commerce, do not indicate that a percentage raise on all traffic, or that a mileage raise on a portion of the passenger traffic, was in contemplation. On the contrary, they rather indicate that, at the time Congress passed the Control Act, there was no immediate necessity for increased revenues, and that, if such necessity should arise, it was contemplated that it could be fully met by applying the remedy which had so recently been sought, and without making possible a general repeal of numerous laws of sovereign states whenever, in the judgment of the Director General, such repeal might seem to be desirable for reasons apart from military efficiency, or even to enable the exercise of an unhampered control of interstate commerce.

The requirement that the Interstate Commerce Commission shall take into consideration "the fact that the transportation systems are being operated under a unified and co-ordinated national control, and not in competition, "does not, in our opinion, broaden the authority of the Director General or the Interstate Commerce Commission, except where it may be sought to correct conditions incompatible with a unified system, and which were probably due to previous unwholesome competition.

The Congressional debates affirmatively disclose that the propriety of compelling the patrons of the railroads to pay all additional costs incident to Federal control was considered and weighed as against the plan

of meeting prospective deficiencies, in part at least, by Congressional appropriation. The question is one with which Congress might well be concerned, for upon its decision would depend whether additional burdens directly due to the war are to be borne by taxation, or whether the particular burden must be borne by those who use the service,—a service which has been inextricably interwoven into the business fabric of the nation. In the act it is clearly contemplated that only such added burden may be placed upon the traffic as is "*fairly* chargeable to railroad operating expenses," and the President is also authorized to meet deficiencies from the appropriation. The act, as we view it, is neither a revenue measure nor a general license to supplant pre-existing regulations made by competent authority.

Another significant fact which is disclosed by a study of the Congressional debates upon the subject of the rate-fixing power is that all of the discussion of § 10, pertaining to the power given the President to initiate rates, concerns only the merits of that proposal as compared with a proposal to vest the power directly in the Interstate Commerce Commission, so that it might continue to exercise, in but slightly modified form, the authority previously vested in it. Nowhere was it suggested that the powers of the Commission should be extended to embrace original regulations of intrastate rates, nor was it ever intimated, so far as our observation goes, that the powers contended for were being vested in the Executive.

Being of the opinion that the rate statutes of this state and the tariffs on file with the state railroad commission, in accordance with statutory requirements, in so far as they pertain to intrastate commerce, have not been lawfully superseded by any competent order made by the Director General under the Rail Control Act, and particularly by general order No. 28, a writ will issue in accordance with the views expressed in the foregoing opinion.

CHRISTIANSON and ROBINSON, JJ. concur.

ROBINSON, J. (concurring specially). This is an action by the state of North Dakota against several railway carriers and those who control and operate the railways, to prevent them from continuing to rob the people by the exaction of excessive passenger and freight rates, contrary

43 N. D.—37.

to the laws of the state. The right of action arises under the Constitution and laws of the state, and not under the laws of the United States. Hence, the jurisdiction of the court is in no way questionable, and it is expressly and fully conceded. In the operation of the public highways between points within the state, there must be a compliance with the laws of the state, or the laws are not laws; and the courts must maintain and uphold the laws of the state and protect the people from plunder and robbery in any form, or else the courts are mere cravens, and not courts.

The claim is that the railroads are operated under acts of Congress, by direction of the President, and his appointed Director General, and it is conceded that the operation is not in accordance with the laws of the state. As it appears, on every railroad and system of railroads in the United States, extending over about 400,000 miles, the passenger fares and freight rates have been advanced from 25 to 50 per cent. The advance was made as a war measure under the plea of military necessity; but now, in this year of peace, it is continued in defiance of the just laws and powers of the several states. The assumed railroad control and the orders of the President are based on acts of Congress. In August, 1916, at the time of some trouble with Mexico, Congress passed an act as follows: "The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system . . . of transportation, . . . and to utilize the same . . . for the . . . transportation of troops, war material, and equipment." This was a nice rider on the Army Appropriation Act, covering forty-eight pages of the statute. 39 Stat. at L. 645, chap. 418, Comp. Stat. § 1974a, 9 Fed. Stat. Anno. 2d ed. p. 1095. The rider is short and simple. Its manifest purpose was to authorize the President, in time of war, to use the military force to control and operate railroads for the removal of troops and war supplies, —"only that and nothing more." But, in December, 1917, after Congress had declared war against Germany and Austria, the President magnified his power and issued a fiat or proclamation, assuming the possession and control of all railroads for all purposes, regardless of any military necessity. The fiat decreed that the possession and control should be in his famous son-in-law, as Director General. By the same fiat the President attempted to legislate, and he decreed that, except with the written consent of the Director General, no attachment by a

mesne process or by execution should be levied on the property of the railway carriers; that no suit may be brought against them, except as permitted by the general or special order of the Director. By this order the President innocently attempted to repeal or suspend a vast system of Federal and state laws and constitutions, and to make his famous son-in-law the greatest dictator on earth. But, in March, 1918, Congress passed the Federal Control Act, which expressly repealed the legislative part of the fiat. The act provides thus: That actions at law and suits in equity may be brought by and against such carriers, and judgments rendered in actions at law or suits in equity against the carriers. And that no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the government. Under that act it is manifest that wrongdoers who control a common carrier and exact excessive rates and fares in defiance of the laws of the state cannot defend themselves on the ground that in so doing they are an agency of the government.

Section 10 of the act provides the President may initiate rates, fares, and charges by filing the same with the Interstate Commerce Commission, and "that said rates, fares, and charges must be just and reasonable." Also, that on complaint the justness and reasonableness of such rates may be determined by the Interstate Commerce Commission in accordance with the Act to Regulate Commerce as amended. But as the act of Commerce gave the Commission no power to regulate rates between any two points or places of a state, it must be that the Federal Control Act refers only to interstate rates. Congress did not contemplate that the President or his Director General should attempt to initiate intrastate rates, contrary to the laws of any state. Certain it was not within the power or the purpose of Congress to give the President and his famous son-in-law the right to repeal and undo the rate laws of any state. That is shown to a demonstration by § 15 of the act: "Section 15. Nothing in this act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds." [40 Stat. at L. 458, chap. 25, Comp. Stat. § 3115¾o, Fed. Stat. Anno. Supp. 1918, p. 765.]

Now in reading § 15, some question may arise as to what is meant by the *lawful police power of the several states.* Does it include the rate-making power? Does it include a power to prevent the people from being robbed by the excessive rates and exactions of carriers or by those in control of them? Clearly the purpose of police laws and police powers is to prevent filching, robberies, and holdups, to protect life, liberty, and property. So far as a man is dispossessed of his property, his means of living are impaired. "You do take my life when you do take the means whereby I live." The carrier is employed by the force. of necessity; When the employer is forced to pay excessive rates, then, to the extent of the excess, he is filched, robbed, and held up. "Such is the scope of police power that it extends to the protection of the lives, health, comfort, and quiet of all persons, and the protection of all property within the state." 8 Cyc. 864. Under the police power the legislature may enact just laws that common carriers shall not charge more than certain maximum rates. In every state such laws have been passed and have been uniformly sustained by the highest courts. 8 Cyc. 874. Hence it is that nothing in the Federal act must be so construed as to amend, repeal, impair, or affect the *lawful police regulations of the several states.*

As the Federal Control Bill was first submitted to Congress, it was strictly an administration measure, conforming to the proclamation of the President; but in each House, and in conference, it was carefully considered and finally passed with salutary amendments, and among them the last and most important was § 15. While the act empowered the president to initiate interstate commerce rates, subject to review by the Commission, it expressly provided that the rates should be just and reasonable. It did not contemplate the addition of a billion dollars a year to the burden of the wealth producers by a general and uniform advance of 50 per cent in all rates and fares. And this court may well take official notice of that fact that such an advance was not just or reasonable; that it was contrary to a recent and prior ruling of the Interstate Commerce Commission refusing to permit an advance of 15 per cent.

It was in the spring of 1918, when the food supplies were reduced and when the people were contributing their utmost to the war fund, that Congress gave the carriers half a billion dollars, and then, by

advance rates, the Director General gave them $1,000,000,000. Without any such advance James Hill ran his railroads, and in the course of a few years he saved up for himself and heirs over $100,000,000, besides good sums for many others. Under the former rates in a few decades the rail carriers succeeded in filching from the people 10 per cent or one-tenth of the total wealth of the nation.

There is no reason for extending the discussion. It is a well-known fact that the rail carriers have always charged excessive rates, and that they are fast amassing the wealth of the country. By skill, prudence, and economy the Director General might well have reduced the cost of operating the railroads, and, indeed, when the Federal Control bill was before Congress, he was called as a witness and gave assurance that the result of Federal control would be to reduce the expenses—and such was the assurances under which the bill was passed. The Director could well have reduced the burden of rates and fares instead of advancing them; but, however that may be, now that the war has ended, there is no longer any reason or excuse for any person on earth to operate railways in disregard and defiance of the *lawful police regulations of the several states*. It is beyond the constitutional power of Congress and the national government, and, so far as persisted in, it must lead to anarchy, Bolshevism, and endanger the safety of the Republic. The writ of mandamus should be awarded.

GRACE, J. (disssenting). An alternative writ of mandamus was issued out of this court. The purpose of such writ is to command and prohibit the defendants from collecting increased fares or rates over and above those stated in certain schedules on file with the board of railroad commissioners of this state for carrying passengers, freight, and baggage between intrastate points, or to show cause why the rates, fares, and charges specified in said schedules should not be in force, instead of the increased rates initiated by the President of the United States, and which are now being charged and collected. Walker B. Hines is the direct representative of the President of the United States, and together they represent the United States, so that, in fact, the action is one of the state of North Dakota against the United States to determine the authority of the defendant to initiate and collect the rates complained of.

Congress passed an act which was approved August 29, 1916, by which the the President, in time of war, is empowered through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same to the exclusion, as far as may be necessary, of all other traffic thereon, for the transfer or transportation of troops, war material, and equipment, or for such other purposes connected with the emergency as may be needful or desirable. Congress, by an act of March 21, 1918, gave the President, during the time of war, control of all traffic over systems of transportation, with exclusive power to initiate rates, fares, and charges by filing them with the Interstate Commerce Commission within the time and manner specified in the act under consideration. Congress in the exercise of the constitutional authority vested in them, by joint resolution of the Senate and House of Representatives, on the 6th day of April, 1917, formally declared war against the Imperial German Government; in such resolution, Congress authorized and directed the President to employ the entire naval and military forces of the United States and the resources of the government to carry on war against the Imperial German Government, and to bring the conflict to a successful termination, Congress pledged all of the resources of the United States. On December 7, 1917, the Congress of the United States, by resolution, declared war to exist between the United States of America and the Imperial and Royal Austro-Hungarian Government; and this resolution contains the same authority and direction to the President as is contained in the resolution wherein war was formally declared against the Imperial German Government, with reference to the employment of the entire naval and military forces of the United States and the resources thereof, and the pledge of all the resources of the United States to bringing the conflict to a successful termination. Under and by virtue of the authority vested in the President of the United States by authority of the Act of August 29, 1916, he did, through Newton D. Baker, Secretary of War, take possession of and assume control at 12 o'clock noon on the 28th day of December, 1917, of each and every system of transportation and the appurtenances thereof, located wholly or in part within the boundaries of the continental United States, as is more fully shown and set forth in the proclamation at that time by the President of the United States, duly issued and

published. By this proclamation, were not taken over electric passenger or interurban railways, but the right was reserved by subsequent order or proclamation to do so if it were found necessary or desirable. It was further stated in the proclamation that by subsequent order and proclamation, possession, control, and operation, in whole or in part, might be relinquished to the owners of the railroad systems of railroad and water systems, the possession and control of which had been assumed. Congress on March 21, 1918, approved the act for the operation of transportation systems while under Federal control, which provided for the just compensation of their owners and for other purposes.

The construction of certain sections of this act is the task with which we are confronted. For the purpose of properly construing the Federal Court Act and war powers of the President, it would be well to mentally place ourselves back to the 28th of December, 1917, and from thence look forward into the future as it then presented itself; instead of looking from the point where we now are retrospectively to the 28th day of December, 1917. If we should do this, we would realize that transportation for war purposes and as a whole under private control had largely become inefficient; that at such time there were millions of soldiers to be transferred to training camps; that millions upon millions of tons of war material were to be transported from the place where produced to the place of manufacture, and the finished product again to be transported; that millions of tons of food stuffs and clothing had to be transported to the various places where the soldiers were in camps, for their use. The magnitude of transportation for war purposes alone was so stupendous that it is almost beyond the comprehension of those not so situated as to have an opportunity to acquaint themselves with the immensity of the task of the transportation of the necessities of war. It must be remembered that all of this was an added burden to the transportation facilities of our country. Again, we think it is a matter of common knowledge that the transportation systems, prior to the declaration of war and prior to the time the almost illimitable amount of war transportation was added to the work of the transportation companies, were finding difficulty in properly handling and transporting the products of trade, production, and manufacture which were tendered them for transportation during times of peace. It is apparent, therefore, that Federal control was taken for the purpose of facilitating

transportation and· systematizing it to the end that transportation systems, under Federal control, would be efficiently reorganized, so that more service could be rendered by them and much more material transported over them.

We must also keep in view the fact that when war is once officially declared by the duly constituted authorities of the United States with whom the power is placed, by the Constitution, to declare war, that a state of war continues to exist until a treaty of peace is signed with those against whom war was declared, and until such treaty of peace by the President's proclamation is duly proclaimed. The President having by due proclamation taken over the transportation companies, each and every official and employee, and all those who entered the employ of the transportation companies after being taken over by the Federal government, were thereafter, by proper authority, duly constituted and made officials and employees of the Federal government, and, as such, were employed and paid by the Federal government. With these preliminary observations, we may proceed to examine some of the real issues presented in this case. The paramount issue presented is that which relates to

### A Conflict of Power.

The conflict of power arises between certain tribunals, as state railroad commissions, possibly the Interstate Commerce Commission, and the powers conferred upon the President under the Federal Control Act, or possibly other war powers possessed by the President, as to which has the lawful authority to fix passenger and freight rates and other charges during the time of the war, on intrastate commerce. We think, in this discussion, it will not be necessary to advert to other war powers possessed by the President than those conferred upon him by the Federal Control Act. In time of peace, it may be conceded that certain state tribunals, as the state railroad commission, have the exclusive power to fix all intrastate rates of transportation, likewise the Interstate Commerce Commission, in time of peace, has exclusive power to determine the reasonableness and justness of rates affecting interstate commerce, and, since the Act of the Interstate Commerce was amended, the power to prescribe rates and the power to prescribe an intrastate rate where that rate is such as to cause a discrimination in an interstate rate between a point or points within the state to a point or

points without the state. These constitute the general powers of such tribunals in time of peace.. They·are such powers, however, as are intended to be exercised only in times of peace, with the exception that Interstate Commerce retains power in the act under consideration, upon complaint being made, to pass upon the reasonableness and justness of rates initiated in war times by the President, and, with this single exception, all other powers with reference to rate making and the fixing of charges and fares for transportation .systems are, by the Federal Control Act, suspended during time of war; such power is supplanted, for the time of war, by the power of the President to initiate rates, which, when initiated by him, become binding and effective as to every kind of transportation from the time they are filed with the Interstate Commerce Commission, and are subject to no change except, upon complaint to the Interstate Commerce Commission, such rates and fares may be examined as to their reasonableness and justness, which must be determined upon the conditions which exist in time of war, and not those of peace. With this exception, there is no limitation upon the power of the President with reference to the initiation of rates, charges, and fares. The power of the President, under the Federal Control Act, to initiate rates, fares, and charges, contains no limitation as to kind, and extends equally to interstate and intrastate fares, rates, and charges. The Federal Control Act contains no limitation other than as above stated. It is claimed there is a limitation by § 15, but we will disprove this contention later in this·opinion.

The power conferred upon the President by the Federal Control Act, with reference to rates, was intended to be a power with which there could be no interference, with the exception of that of the Interstate Commerce Commission as to the reasonableness and . justness thereof. The power was intended by Congress to be one which would enable the President, by use thereof, to accomplish without delay or interference the objects intended to be accomplished by the Federal Control Act. If this be true, then the rate-making powers of all other tribunals must be suspended during the time of war, including that of the Interstate Commerce Commission, except as it is preserved in the Federal Control Act. If, as is contended by plaintiff, the power to initiate and prescribe rates as to intrastate remained the same in time of war as in time of peace,. then it would be within the power of the state or states, through the

railroad commissions, or rate-making power within the state, to make any power conferred upon the President by the Federal Control Act an empty, impotent power. The President having at a certain date advanced the freight rate 25 per cent on all freight thereafter carried by the transportation systems within the continental United States, the effect would be to increase the intrastate rate 25 per cent. Let us assume that, after the President had initiated such advanced freight rate, each state railroad commission should thereafter proceed to fix the intrastate freight rates and readjust them, and that the final result of their deliberations resulted in a decrease of intrastate freight charges of 35 per cent; it is not difficult to comprehend that if such could be the case, the advanced freight rate so initiated by the President of the United States for a war purpose, at least in part, would fail of accomplishing the purpose for which it was intended; and in this discussion it must be assumed that the President would not advance the rate any more than the necessity of war required. The 25 per cent advance of freight rates initiated by the President did affect all freight, and was chargeable upon all freight, both intrastate and interstate. If, as contended by the plaintiff, the power to fix intrastate rates remained, during time of war, unimpaired by the order of the President which made the 25 per cent increase in intrastate freight rates, and if such order of the President was subordinate to the power of the railroad commission of the state to prescribe the intrastate rate and determine its reasonableness and justness, under this contention, before the President could make effective the said increase on intrastate rates, it would be necessary for him to procure the assent of the rate-making power of each state before he would have power to increase the intrastate freight rate in the manner in which it was increased. If the President were required to do this, it might take a long period of time before the President would get the rate-making power of each state to approve of the intrastate rate initiated by him. If the state, in war time and in the light of the Federal Control Act, possesses the power above claimed for it, such power would constitute a limitation on the right of the President to initiate rates and fares, and the possession and use of such power by the state, in time of war, could not but affect the transportation of troops, war material, and government supplies, and, in addition to this, have a general tendency to decrease the efficiency of the systems of transportation in general.

We are satisfied that during war time, in view of the Federal Control Act, no state tribunal has any authority to initiate, prescribe, determine, or fix an intrastate rate; that by the Federal Control Act, during the time of war, the power to fix rates and charges, both interstate and intrastate, was placed exclusively with the President, and he has the exclusive power to initiate them; no other power can initiate rates or charges; and such rates and charges as he does initiate under such power can only be examined as to their reasonableness and justness by the Interstate Commerce Commission. The Federal Control Act was meant by Congress to become effective at once, and to become an effective means in the hands of the President, whereby he could wholly control and operate the transportation systems of the United States, including the exclusive power to initiate rates and charges for transportation. Congress did not intend that the President, in time of war, should be hampered nor delayed in any manner in the control and operation of transportation systems so taken over, and, for that very reason, placed the exclusive power to initiate the rates and charges with him; and in order that the President might immediately proceed in such matters and make the transportation companies more efficient, and that such powers might be at once exercised, it was declared that the act in question was emergency legislation; and that fact is evidence that it was the intention of Congress that all powers therein conferred by Congress upon the President were to be exercised by him promptly and without delay; this was indisputably necessary by reason of the pressing necessities then existing for immediate efficient transportation. The power to initiate all rates and charges was lodged with him during the time of war, thus removing from his path the power of state tribunals, such as railroad commissions, during such time, to interfere with the rates or charges for transportation initiated by the President.

It must also be remembered, in construing the Federal Control Act and the President's right to initiate an increase of 25 per cent in the freight rate, that certain conditions existed of which the following may be mentioned: The large increase in the wages of thousands upon thousands of employees who were operating the transportation systems while under Federal control, the millions of dollars that must be expended to rehabilitate the transportation systems to make them more efficient in transportation, the accumulation of a reserve fund to insure a

ready means to maintain the efficiency of the systems, and many other matters we might mention which would demonstrate the necessity of an increased rate or charge. It must follow that the power to initiate and make effective such increased rates or charges in time of war, and in view of the immediate necessity, must be lodged where it could be exercised immediately, and where the exercise of it could not be delayed by agencies such as a state railroad commission, which had theretofore exercised such power. Hence, the power to initiate rates and charges, either passenger or freight, of the transportation systems, was exclusively by the Federal Control Act, placed with the President, with no limitation other than, upon complaint, an examination might be had of them before the Interstate Commerce Commission to determine the reasonableness or justness thereof. We think the interpretation we have so far given the act in question is correct. We are strengthened in this assumption by the contemporaneous construction given the act by those upon whom devolved the duty of interpreting and enforcing the act, and also by the interpretation given the act by those who were affected by it; during all the time of the operation of the act until the present time neither the railroad commission of any state, nor shippers, nor anyone compelled to pay the increased interstate or intrastate rate, had made any complaint. They, and all persons affected by the act, have uniformly placed the same construction upon it as the President of the United States did. They have acquiesced in the construction thus placed upon it by the President of the United States and those charged with its enforcement. The act being one the powers of which the President was to execute, his acts thereunder must be considered executive acts. It must be conceded that he used his best executive discretion in the execution of such powers, and, this being true, the court should be reluctant to interfere with his exercise of such discretion.

The most important remaining point to be discussed is the meaning of § 15, which is to the effect that nothing in the act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the state in relation to taxation, or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds. It is claimed by the state that the power to prescribe or initiate a rate or charge for transportation is a

police power.  Assuming that to be true, and assume, further, that every state law, to a greater or lesser extent, is a police power in that, in some degree either present or remote, it may affect the health, safety, and morals of the people of the state, it is clear that as the term is used in § 15 it has no such extended meaning.  What is intended by the words "police regulations" as used in § 15 are those police regulations with which all are familiar, those which it can readily be understood have a direct relation to the health, safety, or morals of the people.  The words are susceptible of two uses,—one broad and comprehensive, the other narrow and restrictive.  If we speak of the initiation or regulation of rates and charges as a police regulation or a police power, the use is in the broad and comprehensive sense; when we say that the police powers ars as broad as the sovereignty of a state, this is the most comprehensive sense; but, as the words are generally used and commonly understood by the great mass of people within the state or within the nation, they have a restricted meaning, and mean only such police powers or regulations as exist for the purpose of directly protecting the health, safety, or morals of the people.  For instance, a police regulation which prescribes quarantine in case of smallpox or other contagious or infectious disease is a police regulation which acts directly to protect the health of the people by preventing the spread of the disease; and so an illustration might be given as applying to morals or safety, and it is in this restricted sense that the word is used in § 15.  Certainly the words "police regulations" in § 15 do not refer to rate, for Congress by § 10 of the act had wholly disposed of the rate question.  It had, by that section, placed the power, during the time of war, exclusively with the President, to initiate rates, and this meant all rates and every kind of a rate relating to transportation, and had exclusively placed the power, during the time of war, to review the reasonableness and justness of such rate, with the Interstate Commerce Commission.

There is a well-settled rule of statutory construction, which is, that the intention of the whole act will control the interpretation of the parts.  Sutherland, Stat. Constr. 319.  The intention of the Federal Control Act is easily discerned.  It plainly appears from it that it was the intent of Congress to place the control and operation of all transportation systems with the President, and that he had full authority to initiate all rates, fares, and charges for transportation.  This was the

cardinal purpose or intent of the whole act. Each part of the act must be construed in harmony with the general intent and cardinal purpose of the act. Section 15, being a part of the act, must be construed so as to harmonize with the general intent and purpose of the act as expressed in it, and which we have above pointed out.

The powers enumerated and granted in the Federal Control Act to the President are wholly and exclusively war powers. When the war shall have been terminated, and treaties of peace shall have been signed with those with whom we are at war, and when such treaties of peace have been duly proclaimed by the President, we shall then have returned to a state of peace, and after the expiration of not more than twenty-one months thereafter, the war powers conferred upon the President in the Federal Control Act will not further be effective so long as a state of peace continues. At the expiration of twenty-one months after a treaty of peace has been signed, and by the President proclaimed, and in the absence of further Federal legislation retaining for a longer period of time control of the transportation systems of the United States, or unless the President has theretofore relinquished such Federal control, such transportation systems will be returned to their owners, and will again become, at that time, subject to the same rates, fares, and charges for transportation as existed at the time the President, by proclamation, took Federal control of such transportation systems; and the power to initiate and prescribe fares, rates, and charges will again be the same in the states and the Interstate Commerce Commission as existed at the time of the taking of Federal control of such systems, which powers were, as we have seen, suspended in the manner above stated during the time of war. At such time when such transportation systems are returned to their owners, if they be so returned, all state regulations and powers will be again revived, and be of the same force and effect as they were at the time of the taking of Federal control. The power of the state, at the time of taking of Federal control, to prescribe fares, rates, and charges, was not repealed, but merely suspended during the Federal control, and, upon the termination of that, will again have the same force and effect as at the time of taking Federal control.

The Federal Control Act is one that conferred upon the President certain rights, authority, and power with reference to initiating rates and charges for transportation. If anyone had a just complaint with

reference to rates, fares, and charges initiated by the President, the act itself prescribed a definite remedy. If complaint were made that the rates and charges and fares were unreasonable, the Interstate Commerce Commission had full power and authority to examine into the complaint with reference to the unreasonableness or unjustness of any fare, rate, or charge, and it could, after a hearing upon the complaint, fully determine as to the reasonableness or justness of the fare, rate, or charge. Thus there was a complete remedy. Where a statute or an act creates a right, authority, or power, and provides a remedy for its enforcement, and provides a remedy for those who may claim to be injuriously affected by it, such remedies are generally held to be exclusive. United States v. Stevenson, 215 U. S. 190, 54 L. ed. 153, 30 Sup. Ct. Rep. 35; Globe Newspaper Co. v. Walker, 210 U. S. 356, 52 L. ed. 1096, 28 Sup. Ct. Rep. 726; Dollar Sav. Bank v. United States, 19 Wall. 227, 22 L. ed. 80.

It is conceded the rates and charges fixed by order No. 28 have not been scheduled nor filed with the state railroad commission before they were put into effect, as § 4725 of the Compiled Laws of North Dakota of 1913 provides; that the schedule of fares, rates, and charges under order 28 were only filed as a matter of courtesy for the use and information of the board of railroad commissioners of North Dakota, and not in compliance with § 4725.

The main contention of plaintiff is that there is no authority for the President, under the Federal Control Act, to increase rates, fares, and charges on transportation which is wholly intrastate. In finally disposing of this matter, as we view it, it must be presumed that the President, and every subordinate officer or Federal employee acting under his authority, in executing the powers conferred upon him by the Federal Control Act, were, at all times, in the execution of such powers, acting in the highest good faith. It must also, be presumed that the President did not initiate a higher fare, rate, or charge than was necessary to maintain the efficiency of the transportation systems taken under Federal control, and that it was necessary to fix such rates and charges as he did, for the purpose of transporting troops and war material, and for the further purpose of maintaining the efficiency of the transportation systems, so that all transportation immediately connected with war purposes might be promptly carried on as well, as all other transportation.

The 25 per cent increase of freight rates on intrastate commerce in all of the states, we can readily understand, would amount to many millions of dollars. It would constitute a substantial part of the amount of revenue raised by the 25 per cent increase on all freight. It would constitute a considerable share of the means and funds whereby transportation of every kind could be made efficient. It would constitute a large fund which would assist in paying the hundreds of millions of dollars of increased wages to Federal employees of the transportation systems while under Federal control, and without this large amount the operation of the transportation systems under Federal control would be impaired, and their efficiency for all purposes decreased, and thus affect the transportation of troops, war materials, and government supplies.

It seems clear that the act in question is one conferring upon the President war powers. The language of the act is clear, and it confers upon the President the exclusive power to initiate all rates upon the transportation systems of the continental United States during the time of Federal control, and, during that time, his right to do so cannot be limited by the state. It is clear that such power included the right to initiate all rates, both on interstate and intrastate commerce, during Federal control of the transportation systems; and that all such rates should become effective by filing the same with the Interstate Commerce Commission upon one day's noticee. If the conclusion at which we have arrived is correct, and we think it is, the contentions of the plaintiff cannot be upheld, the writ of mandamus issued by this court should be quashed.

BRONSON, J. I dissent. In my opinion the majority opinions wholly ignore the fundamental considerations of law involved in this action. If mandamus is awarded and maintained now, it ought to have been awarded and made effective when the order was first promulgated. During the crucial period of the great war, now ended, this order was in effect and in force without complaint, and with the acquiescence of this state.

The opinion of Judge Birdzell is based upon the broad proposition that the regulatory powers of the state over intrastate rates were not suspended by the Act of Congress of March 21, 1918, by reason, particularly, of the provisions of § 15 thereof.

Readily, the court may arrive at such a conclusion when it assumes as a premise that the exercise of this war power by Congress is the exercise of the common-law power of regulation, and not the exercise of that higher power, the sovereign right to operate in war times a governmental instrumentality for war purposes, and to prescribe the rates thereof. The purpose for which the railroads were taken and rates prescribed are disclosed not only by the terms of the act, but by the actual purposes for which in fact the railroads were used and the rates were prescribed.

Upon *a priori* reasoning, as I view it, Justice Birdzell holds that the intent of Congress in the act was to prescribe a method of initiating common-law reasonable rates, by the President instead of by the railroads themselves, based upon the old theory that the charge made to the public must be reasonable, and not discriminatory. It is necessary, through this technically narrow construction, to virtually read in the act, §· 10, thereof, the following: "The President may initiate *interstate* rates, fares, charges, etc.," and also to virtually read into such act, § 15 thereof: "That nothing in this act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the state in relation to taxation, *regulation of rates,* or the lawful police regulation, etc." Congress might have so legislated; but it did not so legislate. It gave to the President direct authority to initiate *rates,*— the term used is broader than *interstate rates.* See Employers Liability Cases (Howard v. Illinois C. R. Co) 207 U. S. 463, 500, 52 L. ed. 297, 310, 28 Sup. Ct. Rep. 141.. From the very force of the circumstances then existing with this nation involved in a mighty struggle, in war time, it would seem perfectly obvious that the President, if he were to initiate any rates at all, must initiate rates that applied to both interstate and intrastate commerce. Otherwise the power might as well not have been conferred.

At the time the Act of March 21, 1918, was enacted, Congress recognized that certain transportation systems then were being operated as Federal instrumentalities, under the terms of a proclamation of the President by which state regulatory powers might be or were subordinated. It knew then that the President, through the Director General, was exercising the power to route freight, and that this necessarily included the power to change the rate to shippers. This regulatory power, if exercised, applied to both interstate and intrastate ship-

43 N. D.—38.

ments.   In such Act of March 21, 1918, Congress specifically required
the Commerce Commission to give due consideration to the fact that the
transportation systems then were being operated under a unified and co-
ordinated national control, and not in competition.   In the Minnesota
Rate Cases (Simpson v. Shepard) 230 U. S. 352, 417, 57 L. ed. 1511,
1549, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916A,
18, the United States Supreme Court, in considering the then Federal
statute concerning the powers of the Commerce Commission, stated:
"Neither by the original act nor by the amendment did Congress seek
to establish a unified control over interstate and intrastate commerce."
In such act Congress further required the Commission to give due con-
sideration to the certificate of the President, when made, that increased
railway operation revenues are necessary in order to pay the expenses
of Federal control and operation, etc., to the carriers operating as a
unit.   Although Congress retained the machinery of the Commerce Com-
mission to preserve the reasonable and just character of Federal rates,
as much as possible; it nevertheless appears reasonably clear that Con-
gress, recognizing the exclusive Federal control in operation, both inter-
state and intrastate then existing, meant and intended to give a corollary
and additional war power of exclusive rate making over such systems
under Federal control, by which alone a unified and co-ordinated national
control and operation could be effected.   There is no question that the
President has so interpreted such power, and this Executive interpreta-
tion should not be lightly considered.   Justice Birdzell attacks, in his
opinion, the reasonableness of the rate promulgated as applied to intra-
state Commerce, and holds that prima facie it is discriminatory, and
therefore not justified.   This argument begs the very question upon
which the logic of his decision is founded, namely, that the power ex-
ercised, is the power to regulate rates in interstate commerce as a com-
mon-law power; he argues that the rate promulgated does not purport to
be promulgated for the purpose of obviating discrimination in intrastate
commerce; he must concede that it was, in fact, applied to both inter-
state and intrastate commerce.   If such power be the sovereign power in
war times to prescribe rates, the regulatory power of the state does not
obtain; if it be, as contended by the majority opinion, the power to
regulate the common-law obligation of carriers concerning rates, then
no attempt by anyone has been made to subject these rates, so pro-

mulgated, to review before the Commission which has jurisdiction there-of. Surely, under the authorities quoted in the majority opinion, Congress had authority to grant to the President and the Interstate Commerce Commission the right to initiate, or review, a common-law rate in interstate commerce, and to give authority to the Interstate Commerce Commission and the President, as the initiating power, to so prescribe an intrastate rate which would not, by its terms, or by its effect, serve to interfere with or impede interstate commerce.

It is also worthy of consideration to note that under the state law (Comp. Laws 1913, art. 21, chap. 14) the railroad commissioners of the state simply review, investigate, or determine a rate theretofore established by the common carriers. Even under the state law the common carriers initiate a rate, except statutory prescribed maximum rates. The whole act looks to an exercise of jurisdiction over a private corporation operating a railroad as a common carrier. Nor, either under the state act, or under the present Federal act, can such private corporation, for instance, the defendant railroad herein, initiate a rate, or file a schedule? How, further, under the state law, is any jurisdiction of any kind conferred over or concerning the President in the exercise of his power to prescribe rates? Are we to understand from the majority opinion that it is now the duty of the private corporation owning the railroad, but not having the control or operation of the same, to initiate intrastate rates within the state, and the duty of the President to initiate rates over the same railroad within the state upon interstate commerce?

The opinion of Justice Robinson, by reason of which only the sanction of this court is given for a writ of mandamus herein, needs little comment. It contains no legal discussion. It gives no consideration to the war power of Congress or of the President, or of the necessities of this nation in a time of war to utilize, under the war power, every resource of man and property in the nation. It is merely a diatribe attempting to ridicule our Federal government for its action taken, and for its alleged lack of economy concerning the operation of railroads under Federal control in times of stress and of war necessity. It is rather unfortunate that it happens in this action, the court being so divided, that a writ of mandamus is awarded against our Federal government, based upon an opinion (which under the circumstances is the controlling

factor) directed rather to a discussion of the faults of railway operation, and of principles of expediency, rather than of law and of the war powers and necessities of this nation in war times.

My views upon this matter are expressed in the following opinion prepared in advance of the majority opinions of the court now presented, and, to the view therein expressed, I still adhere. They are therefore hereinafter set forth:

This is an original proceeding instituted upon the relation of William Langer, the Attorney General, against the Northern Pacific Railway Company, and the Director General of Railroads, seeking a writ of mandamus from this court to enjoin the defendants from collecting or enforcing the schedule of freight rates, and passenger fares and charges promulgated, and put in force and operation by the Director General pursuant to general order No. 28, issued May 25, 1918, so far as the same applies to intrastate traffic in the state of North Dakota.

The petition of the relator in substance alleges:— That the President of the United States assumed control of the Railroad in question, under the Act of Congress, August 28, 1916.

That, pursuant thereto, on December 26, 1917, the President issued his proclamation for Federal control, and created the office of Director General to operate the railroads, and that they have been so operated through the Director General since January 1, 1918.

That on March 21, 1918, Congress enacted the Federal Control Act, providing for the compensation, operation, and rehabilitation of transportation lines.

That on May 25, 1918, the Director General issued general order No. 28, whereby on June 10, 1918, certain increased passenger fares and baggage charges, and on June 25, 1918, certain increased freight rates, were promulgated and put in force upon transportation lines, including the defendant railway company.

That, by reason thereof, freight rates in the state of North Dakota were increased 25 per cent and passenger rates from $2\frac{1}{2}$ cents per mile to 3 cents per mile. That the Constitution of this state, § 82, provides for the election of a board of railway commissioners, and that such board always, in this state, has exercised supervision and control over transportation systems operating in and through the state as to intrastate rates and service. That § 4725 Comp. Laws 1913, provides that no railway

corporation may change its fares, rates, or charges for service without first filing such schedule of fares, rates, and charges with such board ten days before the same become effective, and that the railway company, therefore, pursuant to such statute, had filed a schedule of fares, rates, and charges with such board, and that no petition of complaint was filed with the board by such company since such date, asking for any increase in such rates within the state of North Dakota; that the schedule of rates so promulgated, and so put in force by the Director General are without authorization pursuant to the acts of Congress and the proclamation of the President, and that the same does not affect the government transportation of troops, war materials, or government supplies, or the issue of stocks and bonds; that the same are unreasonable and excessive, and constitutes an illegal burden upon the patrons of the railroad company; that they are against the public welfare, convenience, and business interest of the state and contrary to the law of the state.

The answer and return of the Director General admits that the railway company owns the transportation line involved, and that it is an instrumentality both of state and intrastate commerce; it specifically denies that the company has operated its system since December 25, 1917. It specifically alleges that the Director General has exercised possession and control over the transportation line involved pursuant to the acts of Congress and of the President of the United States. It specifically alleges that the Director General, pursuant to general order No. 28, put into full force and effect and applied the said schedule of rates and charges, and specifically denies that the railway company did put the same in force and effect to apply to intrastate business in North Dakota; it specifically alleges that on April 6, 1917, the Federal Congress declared a state of war to exist between the United States and the Imperial German Government; that pursuant to general order No. 28, the Director General, having duly filed the same with the intrastate Commerce Commission, made effective the increased rates, fares, and charges, provided in said order, between points in North Dakota as well as between other points along its line; and that the same are still in effect and force, and the transportation line in question has been and is now conducted, and the collection of such rates, fares, and charges has been made, by and in the name of the Director General of Railroads.

The railroad company interposed a separate answer, or return, alleg-

ing in substance that since December 28, 1918, the possession and control of its transportation system has been under the President of the United States, and that all of its officers, directors, and agents are under the direction of the United States government, and not of the railroad; and, further, that it did not put in force or effect the schedules complained of, and that the same were so put into effect under the sole authority of the Director General.

Upon these pleadings of the parties, the only issues presented to this court are the questions of law that arise upon such pleadings. There is no question presented to this court for its determination as to whether the schedules in force are in fact excessive or unreasonable; nor is there any question presented of discriminatory acts by the Director General, or the railway company, in operating the transportation line under general order No. 28. There is likewise no question presented to this court concerning its jurisdiction to grant the relief sought, so far as it might be contended that the acts in question are those of the Director General, and not those of the carrier, for the reason that the Director General expressly waive this question. The proceeding, therefore, is before this court upon its merits upon the sole question of law, to wit, the legal authority of the Director General of Railroads to maintain in force and effect the schedule of increased rates, charges, and fares promulgated upon and affecting intrastate traffic in the state, contrary to the law of the state, without the supervising control or direction of the board of railroad commissioners.

The century old controversy of the rights of Federal government and of the state in the exercising of their respective sovereign functions is again involved.

In determining the exercise of the power complained against herein, the following questions present themselves for consideration:—

(1) The power of Congress to authorize the Federal control and operation of the railway transportation lines as assumed.

(2) The authority of Congress to prescribe or regulate rates on such transportation systems so taken.

(3) Whether the power granted to the President to initiate rates is a delegation of legislative power.

(4) Whether Congress, if it did possess such powers, expressly exercised the same to create a Federal agency for purposes of operation and rate making.

(5) The power of the state to exercise, under its laws and police regulations, the rate-making power over intrastate traffic upon railways under Federal control.

(6) Whether the emergency for which the Congressional acts were enacted has passed, and the powers conferred thereunder are now ineffective.

The legal consideration of these questions is determinative of the issue presented in this proceeding. They will therefore be considered separately.

1. *The authority of Congress to assume control of transportation lines.*—It will scarcely now be denied that Congress has the power to enact legislation to effect a governmental control over the transportation line involved. The state rather so concedes the power. This power may be drawn from its powers, to declare war, raise and support armies and to make all laws necessary and proper therefor, or from the power to regulate interstate commerce, or even to establish post roads. Const. art. 1, § 8.

Concerning these war powers, in Stewart v. Kahn, 11 Wall. 493, 20 L. ed. 176, the court said:— "The Constitution gives to Congress the power to declare war; to grant letters of marque and reprisal, and to make rules concerning captures on land and water; to raise and support armies, to provide and maintain a navy, and to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions. The President is the Commander-in-Chief of the Army and Navy, and of the Militia of the several states, when called into the service of the United States; and it is made his duty to take care that the laws are faithfully executed. Congress is authorized to make all laws necessary and proper to carry into effect the granted powers. The measures to be taken in carrying on war and to suppress insurrection are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution."

In Pappens v. United States, 164 C. C. A. 167, 252 Fed. 55, the court said: "The execution of these powers assigned to the national government came within the obligation or duties of Congress, and its control over the subject is plenary. Tarble's Case, 13 Wall. 397, 20 L. ed.

597. Power to raise an army to carry on the war was recognized by the pledge of Congress (by joint resolution approved April 6, 1917 [40 Stat. at L. 1, chap. 1]) of all the resources of the country 'to bring the conflict to a successful termination,' and has been executed by the several acts of legislation providing for the organization and support of the Army and Navy and to promote the efficiency thereof. It is obvious that, to avoid calamity to the nation, the powers referred to in their greatest strength must be upheld as indispensably incidental to the power to declare war. It has been written by Story, in reference to the unlimited power of Congress to raise and support armies, that to be of value the power must be unlimited. 'It is impossible,' he wrote, 'to foresee or define the extent and variety of national exigencies and the correspondent extent and variety of the national means necessary to satisfy them. The power must be coextensive with all possible combinations of circumstances, and under the direction of the councils intrusted with the common defense. These must, therefore, be unlimited in every matter essential to its efficacy; that is, in the formation, direction, and support of the national forces.' 2 Story, Const. § 1183."

Under the power to regulate interstate commerce or to establish post roads, Congress has undoubtedly the power to construct, maintain, or operate a transportation line.

In Wilson v. Shaw, 204 U. S. 24, 51 L. ed. 351, 27 Sup. Ct. Rep. 233, an action brought to restrain the Secretary of the Treasury from paying out money in the purchase of property for the construction of the Panama Canal, etc., the plaintiff contended that the government had no authority to engage anywhere in the work of constructing a railway or canal. Justice Brewer, in holding that the decisions of the court were to the contrary, quoted from California v. Central P. R. Co. 127 U. S. 1, 39, 32 L. ed. 150, 157, 2 Inters. Com. Rep. 153, 8 Sup. Ct. Rep. 1073, as follows: "It cannot at the present day be doubted that Congress, under the power to regulate commerce among the several states, as well as to provide for postal accommodations and military exigencies, had authority to pass these laws. The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from state to state, is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and

bridges, it would be without authority to regulate one of the most important adjuncts of commerce. This power in former times was exerted to a very limited extent, the Cumberland or National road being the most notable instance. Its exertion was but little called for, as commerce was then mostly conducted by water, and many of our statesmen entertained doubts as to the existence of the power to establish ways of communication by land. But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed and led to the conclusion that Congress has plenary power over the whole subject. Of course the authority of Congress over the territories of the United States, and its power to grant franchises exercisable therein, are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the Pacific, traversing states as well as territories, and employing the agency of state as well as Federal corporations."

So, in Luxton v. North River Bridge Co. 153 U. S. 525, 33 L. ed. 808, 14 Sup. Ct. Rep. 891, Justice Gray stated as follows: "Congress, therefore, may create corporations as appropriate means of executing the powers of government, as, for instance, a bank for the purpose of carrying on the fiscal operations of the United States, or a railroad corporation for the purpose of promoting commerce among the states. M'Culloch v. Maryland, 4 Wheat. 316, 411, 422, 4 L. ed. 579, 602, 605; Osborn v. Bank of United States, 9 Wheat. 738, 861, 873, 6 L. ed. 204, 233, 236; Pacific R. Removal Cases, 115 U. S. 1, 18, 29 L. ed. 319, 325, 5 Sup. Ct. Rep. 1113; California v. Central P. R. Co. 127 U. S. 1, 39, 32 L. ed. 150, 157, 2 Inters. Com. Rep. 153, 8 Sup. Ct. Rep. 1073. Congress has likewise the power, exercised early in this century by successive acts in the case of the Cumberland or National Road, from the Potomac across the Alleghenies to the Ohio, to authorize the construction of a public highway connecting several states. See Indiana v. United States, 148 U. S. 148, 37 L. ed. 401, 13 Sup. Ct. Rep. 564."

Justice Brewer, with reference to the contentions of the plaintiff that these decisions were *obiter dicta,* stated that plainly they were not; that they announced distinctly the opinion of the Supreme Court on the

question presented; that Congress had acted in reliance upon such decision in many ways, and that the court adhered to the principles stated. 204 U. S. 24.

Concerning the war powers, it is stated in Stewart v. Kahn, 11 Wall. 493, 20 L. ed. 176, as follows: "The Constitution gives to Congress the power to declare war; to grant letters of marque and reprisal; and to make rules concerning captures on land and water; to raise and support armies, to provide and maintain a navy, and to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions. The President is the commander in chief of the Army and Navy, and of the Militia of the several states, when called into the service of the United States, and it is made his duty to take care that the laws are faithfully executed. Congress is authorized to make all laws necessary and proper to carry into effect the granted powers. The measures to be taken in carrying on war and to suppress insurrections are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution."

Concerning the authority of Congress to make all laws which will be necessary and proper to carry into execution the express powers granted, Chief Justice Marshall, in M'Culloch v. Maryland, 4 Wheat. 421, 4 L. ed. 605, stated: "But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

The United States district attorney for this state, of counsel for the Director General, contends that the President could have taken over the railroads, as a war measure, without any acts of Congress, and that the state cannot interefere with his management or use of the road.

Congress having ample constitutional powers concerning the subject-matter, it is unnecessary to consider the war power of the President to take such property without the authority of Congress. This question

was raised in Civil War times, when Congress enacted the statute authorizing the President to take over railroads and transportation lines whenever the public safety required.   12 Stat. at L. 334, chap. 15, Comp. Stat. § 322, 9 Fed. Stat. Anno. 2d ed. p. 911; C. Haney, Congressional History of Railroads, vol. 11, 158.

2. *The authority of Congress to prescribe or regulate rates on transportation systems.*—Does Congress possess the constitutional power to fix or prescribe rates of Federal making which may supersede or subordinate intrastate rate regulations?   A distinction may be drawn between the powers of rate making and of operation; they may be classed, in many respects, as separate and distinct functions.   The power to operate, however, with respect to the efficiency of operation and the prompt movement of traffic, may depend largely upon the rate prescribed; the rate prescribed may facilitate, deter, or even prohibit the movement of certain traffic.   Revenues, when dependent upon rate, may vitally affect the operation of transportation systems.   If Congress possesses the power to control or operate a railroad transportation system, it must necessarily be conceded that it possesses, likewise, the power to prescribe or to fix a method of fixing rates to be charged for the service rendered in operating a governmental instrumentality.   Whether this power flows from the exercise of the constitutional war power, or from the exercise of the constitutional power to establish post roads, or regulate interstate commerce, in any case, the authority necessarily exists as essentially implied in the execution of the power.   It exists, concededly so, in the Federal operation of postoffices, and of the parcel post (Re Jackson, 96 U. S. 727, 24 L. ed. 877), in the control and management of the Panama canal (32 Stat. at L. 481, chap. 1302, 34 Stat. at L. 5, chap. 3, Comp. Stat. § 6827, 8 Fed. Stat. Anno. 2d ed. p. 416), and in various other Federal instrumentalities.

The question involved is not the power of regulation, but the power concerned with operation.   The common-law obligation is imposed upon the common carrier to make charges reasonable and just.   This obligation is subject to regulation by the sovereign power; the legislative sovereign will may prescribe this common-law obligation, a rule of conduct, and fix a rate.   (Munn v. Illinois, 94 U. S. 113, 125, 24 L. ed. 77, 87).   In the above case Justice Waite stated:   "This brings us to inquire as to the principles upon which this power of regulation rests, in order that

we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago in his treatise De Portibus Maris, 1 Hargrave, Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but, so long as he maintains the use, he must submit to the control. See Watkins, Shippers & Carr. 2d ed. § 61.

When, however, the public itself, through its government, assumes management, or exercises a proprietary control over such property as an instrumentality or agency of the government, the very reason for the regulation disappears; there then exists a merger of the interests of the owner and his patrons. Then, in theory of law, the property, theretofore privately owned and operated but affected with a public interest, subject to regulation for the common good, is now operated and maintained as a governmental agency for the common good. The legislative will may then prescribe a rate for the governmental service to be rendered regardless of the common-law obligations of a common carrier; the exercise of such power becomes similar to the power to tax; the Federal Constitution does provide that duties, imposts, and excises shall be uniform; it contains no inhibition against discriminatory rates; the equality clause of the 14th Amendment applies to states only. It is therefore readily appreciated that the power of the states to prescribe or regulate the rates intrastate, of a common carrier privately owned and operated, is entirely different power than the power of the state to prescribe or regulate rates, upon or over a Federally owned or operated common carrier. In observing the distinction, no one will contend that this state, under its right to regulate rates, possesses any authority to regulate or review the charges

made by · the Federal government, for carrying or delivering a letter or a parcel post package through the United States mail intrastate. The argument presented by the state, that the police powers of the state cannot be surrendered and that the supervising of railroad rates is a police regulation within the police powers, does not apply to the question presented. It is unnecessary to consider whether the exercise of the rate-making power is within the police power, for clearly the police powers of the state do not apply to a Federal instrumentality when Congress has specifically legislated concerning the exercise thereof. Furthermore, under the power to regulate interstate commerce, the plenary power of Congress concerning such matter, to the exclusion of the rights of the state, is recognized in the cases cited by the state.

In the Minnesota Rate Case (Simpson v. Shepard) 230 U. S. 352, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916A, 18, the right of the state to exercise its regulatory powers over intrastate rates was expressly based upon the principle that Congress had not taken from the state this power. In the Shreveport Case (Houston, E. & W. T. R. Co. v. United States) 234 U. S. 342, 58 L. ed. 1341, 34 Sup. Ct. Rep. 833, the principle was recognized that Congress had paramount power with reference to interstate commerce and the regulation thereof, but that this did not mean that Congress possessed any authority to regulate the internal affairs of a state.

Likewise, in the Keokuk Case (Illinois C. R. Co. v. Public Utilities Commission), 245 U. S. 493, 62 L. ed. 425, P.U.R.1918C, 1279, 38 Sup. Ct. Rep. 170, and in American Exp. Co. v. South Dakota, 244 U. S. 617, 61 L. ed. 1352, P.U.R.1917F, 45, 37 Sup. Ct. Rep. 656, the power of the Interstate Commerce Commission was restricted within the limits which require a definite showing of interference with the interstate rate prescribed.

Likewise, in the Union Pacific Cases, 9 Wall. 579, 19 L. ed. 792; 18 Wall. 5, 21 L. ed. 787, 3 Fed. 106; 29 Fed. 728, the right of the state to tax the property of the Union Pacific Railway Company, to subject its property to the right of eminent domain of the state, or to affect a physical connection with another railroad, was conceded upon the basic holding that such railway was a private corporation, with property of its own; and that it was not a Federal instrumentality, except as Congress had made it so for special purposes; and it not being shown that

the action of the state interfered with any of these specific purposes, which Congress had required it to fulfil, the sovereign right of the state could act.

It clearly follows, therefore, that under the Federal Constitution, and the interpretation made concerning the powers granted to Congress by the courts, Congress does possess the authority to prescribe the rate to be charged for services rendered by a common carrier as a Federal instrumentality.

3. *The authority of Congress to delegate the rate-making power to the President.*—It would seem to be obvious that if Congress had the power to prescribe a rate for service rendered by a government instrumentality, it possesses the right to prescribe the means by which it shall be determined. Heretofore it has constituted the Interstate Commerce Commission, as a body, to consider the reasonableness of service charges of common carriers in interstate commerce. This body has the power to determine whether a given or proposed rate is reasonable or discriminatory. Under the Act of August 10, 1917, Congress has imposed directly additional powers upon such Commission to grant preference on priority in transportation of traffic, and to fix just and reasonable rates for persons or property in carrying out the directions and orders of the President. This power, so given to the Commerce Commission, is, of course, not a delegation of legislative power. This power, of course, the Congress could impose upon the President or the Director General, as well as upon the Commission (Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co. 167 U. S. 479, 42 L. ed. 243, 17 Sup. Ct. Rep. 896). In United States v. Grimaud, 220 U. S. 506, 55 L. ed. 563, 31 Sup. Ct. Rep. 480, the court said, concerning the delegation of legislative power as follows:—

"From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations —not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done

"Thus it is unlawful to charge unreasonable rates or to discriminate between shippers, and the Interstate Commerce Commission has been given authority to make reasonable, rates and to administer the law against discrimination. Interstate Commerce Commission v. Illinois C. R. Co. 215 U. S. 452, 54 L. ed. 280, 30 Sup. Ct. Rep. 155; Interstate Commerce Commission v. Chicago, R. I. & P. R. Co. 218 U. S. 88, 54 L. ed. 946, 30 Sup. Ct. Rep. 651. Congress provided that after a given date only cars with drawbars of uniform height should be used in interstate commerce, and then constitutionally left to the Commission the administrative duty of fixing a uniform standard. St. Louis, I. M. & S. R. Co. v. Taylor, 210 U. S. 287, 52 L. ed. 1064, 28 Sup. Ct. Rep. 616, 21 Am. Neg. Rep. 464. In Union Bridge Co. v. United States, 204 U. S. 364, 51 L. ed. 523, 27 Sup. Ct. Rep. 367; Re Kollock, 165 U. S. 526, 41 L. ed. 813, 17 Sup. Ct. Rep. 444; Buttfield v. Stranahan, 192 U. S. 470, 48 L. ed. 525, 24 Sup. Ct. Rep. 349. It appeared from the statutes involved that Congress had either expressly or by necessary implication made it unlawful, if not criminal, to obstruct navigable streams; to sell unbranded oleomargarin; or to import unwholesome teas. With this unlawfulness as a predicate, the executive officers were authorized to make rules and regulations appropriate to the several matters covered by the various acts. A violation of these rules then made an offense punishable as prescribed by Congress. But in making these regulations the officers did not legislate. They did not go outside of the circle of that which the act itself had affirmatively required to be done, or treated as unlawful if done. But confining themselves within the field covered by the statute, they could adopt regulations of the nature they had thus been generally authorized to make, in order to administer the law and carry the statute into effect."

As heretofore discussed, the power to prescribe a service charge for a government instrumentality is not the common-law power of determining a reasonable charge; it is the sovereign power to prescribe the charge, or to fix the means of accomplishing the same. It is similar to the power to impose tariff duties; the right of the President to impose a tariff on wheat; it is analogous to the authority granted the President to fix the price of wheat under the food control acts. In fact, under present war measures many similar duties have been imposed or conferred upon the President, *viz.*, freight rates on vessels. Act, July 18, 1918.

Clearly this power, not a power to legislate a rate, not to determine the reasonableness or discriminatory character of a rate, is a right that may properly be granted, within proper bounds, not transgressing the delegation of a legislative power, to the President. Marshall Field & Co. v. Clark, 143 U. S. 649, 36 L. ed. 294, 12 Sup. Ct. Rep. 495.

4. *Whether Congress, if it did possess such powers, expressly exercised the same to create a Federal agency for purposes of operation and rate making.*—The Act of August 29, 1916 (39 Stat. at L. 645, chap. 418, Comp. Stat. § 1974a, 9 Fed. Stat. Anno. 2d ed. p. 1095) provides: "The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

It is apparent that Congress by this act intended to exercise and did exercise its war power. The paragraph in question was incorporated into the Army Appropriation Act; evidently the enactment was intended to provide for our troops in Mexico, and to provide full authority in the President in case of any difficulties with Mexico. Unquestionably, it gave to the President the direct authority in time of war, to take possession and assume control of the transportation lines involved.

On April 6, 1917, a state of war was formally declared to exist by Congress, between the United States and the Imperial German Government. On December 7, 1917, Congress authorized and directed the President to employ the entire naval and military resources of the United States, and the other resources of the United States, to carry on the war, and to bring the conflict to a successful determination. On December 28, 1917, the President of the United States, pursuant to the Act of August 29, 1916, and the resolutions of Congress declaring war on Germany and the Austro-Hungarian government, did take possession and assume control of transportation lines, including the transportation line involved herein; and he expressly directed that the possession, control, operation, and utilization of such systems of transportation should be exercised through the Director General. His proclamation further provided that such systems should be utilized for the transferring and trans-

portation of troops, war material, and equipment, to the exclusion, so far as may be necessary, of all other traffic thereon; that so far as such exclusive use be not necessary or desirable, such systems of transportation should be operated and utilized, in the performance of such other services as the national interests may require, and of the usual and ordinary business and duties of common carriers. The proclamation further provided that "until and except so far as said Director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission, and to all statutes and orders of regulating commissions of the various states in which said systems or any part thereof may be situated. But any orders, general or special, hereafter made by said Director, shall have paramount authority and be obeyed as such." [40 Stat. at L. 1734.]

Under this proclamation and the authority theretofore conferred, the possession and control of railways, as outlined in the proclamation, was taken. It can scarcely be contended that the President did not properly determine an urgency and immediate necessity for so doing. By this act of the President the private property of the carriers became subject to the public use required to meet the public necessities then existing. Under this assumption of power the transportation systems passed under governmental operation. There can be little question that then and there they became Federal instrumentalities to the extent of the purpose for which control and possession of the same were taken. As such, in operation in the manner in which the trains should be operated, traffic should be handled, passengers carried, merchandise transported, they became subject to the orders of the Director General, and, in so far as any statute of any state or of any order of any railroad commission of any state served to prescribe otherwise, or was in contravention thereof, the same was subordinated or suspended. These principles obtain not only from the nature of the power conferred upon the Federal government to carry on war, but also from the reciprocal duty of the states to aid and assist the Federal government, in times of war, by subordinating every state agency which may serve to interfere with the successful prosecution of the war, and of the enforcement of the war powers. Under this act, providing the assumption of control, there was no attempt to legislate or exercise the rate-making power.

43 N. D.—39.

Under the Act of March 21, 1918, Congress recognized that the President had, in time of war, taken over the possession and use, the control and operation, of certain transportation systems. It provided for an annual compensation to the railway corporations equivalent to their respective, average annual railway operating income for the three years, ending June 30, 1917. It provided that railway operating income accruing during the period of Federal control, in excess of such compensation, should remain the property of the United States. It further provided that taxes assessed under Federal or any other governmental authority, for the period of Federal control, on the property used under such Federal control, or on the right to operate as a carrier, or on the revenues derived from operation, should be paid out of revenues derived from railway operations while under Federal control, excepting that war taxes assessed under the Act of October 3, 1917, or subsequent acts, should be paid by the carrier out of its own funds, and also assessments for public improvements, or taxes assessed on property under construction. The act also provided that the President might execute any of the powers conferred with relation to Federal control through such agency as he may determine, and that he may fix a reasonable charge for the performance of services in connection therewith, and may avail himself of the advice, assistance, and co-operation of the Interstate Commerce Commission; that, furthermore, during the period of Federal control, whenever in his opinion the public interests requires, he, the President, may initiate rates, fares, and charges, classifications, regulations, and practices, by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the Commission pending final determination. The act further provides that—

"Said rates, fares, charges, classifications, regulations, and practices shall be reasonable and just and shall take effect at such time and upon such notice as he may direct, but the Interstate Commerce Commission shall, upon complaint, enter upon a hearing concerning the justness and reasonableness of so much of any order of the President as establishes or changes any rate, fare, charge, classification, regulation, or practice of any carrier under Federal control, and may consider all the facts and circumstances existing at the time of the making of the same. In determining any question concerning any such rates, fares, charges,

classifications, regulations, or practices or changes therein, the Interstate Commerce Commission shall give due consideration to the fact that the transportation systems are being operated under a unified and coordinated national control and not in competition.

"After full hearing the Commission may make such findings and orders as are authorized by the Act to Regulate Commerce as amended, and said findings and orders shall be enforced as provided in said act: Provided, however, that when the President shall find and certify to the Interstate Commerce Commission that in order to defray the expenses of Federal control and operation fairly chargeable to railway operating expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, the Interstate Commerce Commission in determining the justness and reasonableness of any rate, fare, charge, classification, regulation, or practice shall take into consideration said finding and certificate by the President, together with such recommendations as he may make." [40 Stat. at L. 456, chap. 25, Comp. Stat. § 3115¾ j, Fed. Stat. Anno. Supp. 1918, p. 763.]

The act also provides the sum of $500,000,000 of Federal moneys, which, together with the funds available from operating income, shall be used as a revolving fund for the purpose of paying the expenses of Federal control, and compensation to carriers, and providing equipment, etc., and further that moneys and other properties derived from the operation of the carriers during the Federal control are declared to be Federal property. The act further provides that this Federal control shall continue for and during the period of the war, and for a reasonable time thereafter, not exceeding one year and nine months after the date of the proclamation by the President of the exchange of ratifications of the Treaty of Peace. It grants, however, to the President the right to relinquish Federal control at any time he should deem such action needful, or desirable. This act is expressly declared to be an emergency declaration enacted to meet conditions growing out of the war.

It is at once seen that this act directly authorizes the exercise of the rate-making power by the President over transportation lines under Federal control. There can be no question of the intent and purpose of Congress to do so from the very express words of the act. A means and

a method is prescribed for fixing rates to be charged through the agency of the President and the established Interstate Commerce Commission.

It may perhaps be contended that the act granting the power to initiate rates, and providing that they shall be just and reasonable and subject to review or consideration by the Interstate Commerce Commission, is drafted analogously to the Interstate Commerce Act, creating and defining the powers of the Interstate Commerce Commission in the investigation and determination of the reasonableness of rates in interstate commerce. That such act simply incorporated the common-law obligation imposed upon common carriers to make all rates reasonable and just, and that the power of the Commission has been confined by the act and by the decisions of the courts to a determination of the reasonableness and the equality of a given rate. That the power to prescribe a rate is a legislative function; the power to determine its reasonableness, a judicial function; that under the Commerce Act the railways were authorized to initiate rates in interstate commerce, Congress not attempting to prescribe a rate, but providing a method for investigating and determining the reasonableness or discriminatory character of the same through the Commission; that, in the act in question, Congress has not attempted to prescribe a rate, but has simply transferred from the railways to the President the power to initiate a rate, and has left with the Commerce Commission the power therefore possessed to determine its reasonableness; that this displays an intent and understanding to apply the same to interstate commerce, alone over which the Commerce Commission alone has jurisdiction. This contention, somewhat plausible from the analogous means used in the Commerce Act and the Act of March 21, 1918, to initiate and determine rate over common carriers, is to be answered not by a comparison alone of similar language used, but through the intent and purpose of the act in connection with the emergency war situation existing and the public needs and demands occasioned thereby.

It does not follow that Congress simply intended to prescribe legislation for initiating rates, applicable only as interstate, upon a Federal instrumentality, because it constituted as board of review, to act with the President, the Commerce Commission, whose powers theretofore were confined to a determination of the common-law obligation of common carriers.

The Act of March 21, 1918, specifically provides for a method of

presrcibing rates through the action of the President and the Commerce Commission, over common carriers under Federal control. The Commerce Commission are specifically instructed that due consideration be given to the fact that the transportation systems are being operated under a unified and co-ordinated national control and not in competition. They are further directed to take into consideration the certificate of the President, when made, that increased railway operation revenues are necessary in order to pay the expense of Federal control and operation fairly chargeable to railway operating expenses, and to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers operating as a unit. True, the Commission are authorized to make findings and orders as are authorized by the amended Act to Regulate Commerce. The language employed in this regard is not clear. The intent and purpose of the whole act, and the object sought to be gained in the war emergency, however, are clear. A Federal instrumentality was created; the control is direct; the revenues received are government property; the appropriations made out of public funds are for the public purpose of Federal operation. The persons employed as officers, agents, and employees upon such railways are considered employed in the service of the United States. The control of all traffic is directly subject to the orders of the President. It is certainly apparent that these powers conferred upon the President and the Commerce Commission to initiate or review rates upon and over such Federal instrumentalities is not the power to initiate or review a rate that must be just and reasonable under the common-law obligation of common carrier to passengers, shippers, or to the public.

The intent and purpose of the Director General in this regard is well shown in the preamble to general order No. 28, which reads as follows:

"General Order No. 28."

"Whereas it has been found and is hereby certified to the Interstate Commerce Commission that, in order to defray expenses of Federal control and operation fairly chargeable to railway operating expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, and

"Whereas the public interest requires that a general advance in all

freight rates, passenger fares, and baggage charges on all traffic carried by all railroad and steamship lines taken under Federal control under an Act of Congress approved August 29, 1916, entitled 'An Act Making Appropriations for the Support of the Army for the Fiscal Year Ending June Thirtieth, Nineteen Hundred and Seventeen, and for Other Purposes; shall be Made by Initiating the Necessary Rates, Fares, Charges, Classifications, Regulations and Practices by Filing the Same with the Interstate Commerce Commission under Authority of an Act of Congress approved March 21, 1918, entitled 'An Act to Provide for the Operation of Transportation Systems While under Federal Control for Just Compensation of Their Owners, and for Other Purposes.'

"Now, therefore, under and by virtue of the provisions of the said Act of March 21, 1918, it is ordered that all existing freight rates, passenger fares, and baggage charges, including changes heretofore published but not yet effective, on all traffic carried by all said railroads and steamship lines, under Federal control, whether the same be carried entirely by railroad, entirely by water, or partly by railroad and partly by water, except traffic carried entirely by water to and from foreign countries, be increased or modified, effective June 25, 1918, as to freight rates and effective June 10, 1918, as to passenger fares and baggage charges, to the extent and in the manner indicated and set forth in the exhibits hereto attached and made a part thereof, by filing schedules with the Interstate Commerce Commission, effective on not less than one day's notice.

"Given under my hand this 25th day of May, 1918.

"W. G. McAdoo,

"Director General of Railroads."

Furthermore, during the continuance of the war, under the Act of August 10, 1917, heretofore mentioned, powers and duties have been imposed upon the Interstate Commerce Commission, in connection with these war powers of the President, apparently beyond their ordinary powers of determining the reasonableness or equality of rates of common carriers privately owned and operated.

It is apparent that this act directly authorizes the exercise of the rate-making power by the President over transportation lines under Federal control. A means and a method is prescribed for fixing rates to be charged through the agency of the President and the already established Interstate Commerce Commission.

Although the act provides that the rates shall be reasonable and just, and although it provides for a method of complaint and review of the same through the Commission, it is evident that this power so conferred upon the President is not the sole power theretofore possessed by the common carriers to initiate a rate that was just and reasonable to the shippers and for the public. The act, from its very provisions, intent, and purposes, discloses a purpose to confer a power upon the President to prescribe rates to be just and reasonable and to be subject to review. It is true, but nevertheless, an authority in the operation of a governmental instrumentality, for either the following purposes: To provide for a deficit in the operating revenues and to secure the government against loss under its guaranty to the carriers, or to raise revenues for the government under the clause which provides that excess revenue shall be government property.

In either case, the considerations that obtain concerning the common-law obligation of carriers to maintain a just and reasonable rate do not apply.

It is also evident that the President through the Director General, pursuant to general order No. 28, has exercised this specific power granted to him, and for the purposes, in part at least, as above stated. The order has been made applicable to all interstate and intrastate traffic under Federal control. There is no difficulty in understanding the meaning and intent of the order.

In our opinion, for the purposes of war, and the legislation enacted to enable the President to perform the high duties of his office, to carry the war to a successful determination, he possessed the specific power and authority to prescribe and make effective the rates promulgated in such general order.

5. *The power of the state to exercise the rate-making power over intrastate traffic upon railways under Federal control.*—Sec. 15 of the Act of Congress of March 21, 1918, provides as follows: "That nothing in this act shall be construed to amend, repeal, impair or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds." [40 Stat. at L. 458, chap. 25, Comp. Stat. § 3115¾ o, Fed. Stat. Anno. Supp. 1918, p. 765.]

The state contends that this section expressly reserves to the state its authority concerning the rate-making power over intrastate traffic; that it discloses a specific intent on the part of Congress to not inhibit the application of the state laws concerning rates, if the same do not interfere with the governmental purpose for which the railways were taken; that it shows, likewise, a specific intent to not interfere with the power of the state in matters of purely local concern within the state; that, furthermore, the particular use of the term in § 15, "police regulations," includes and means to include the regulation of rates intrastate. From the foregoing discussion of the principles applicable in the operation of the railway under Federal control, it is evident that the contentions of the state cannot be upheld. The control, possession, and management of the railway systems involved being for governmental purposes, and as a governmental instrumentality, the power of the state heretofore existing to exercise rate-making power, to impose and require reasonable charges for services rendered by a common carrier performing a public service, does not obtain; at least this is, so far as the act prescribes a power, which has been exercised inconsistent with the exercise of such power, likewise by the state. Otherwise, in the act, the specific power is granted to the President to initiate and prescribe rates upon railways under Federal control in conjunction with the Interstate Commerce Commission. As heretofore stated, Congress, under its war powers, had ample authority so to do. It is apparent that § 15, concerning the powers of the state over taxation and lawful police regulation, may properly apply to the property of private carriers not devoted to Federal control, under the act, or even may apply to such property so taken under the Federal control except as otherwise the act inhibits the exercise by a state, of power concurrent with that of the President. The state contends that the term "lawful police regulations" means the exercise of the police power of the state, and that this police power of the state cannot be surrendered. Again it is deemed unnecessary to distinguish when a police regulation is the exercise of a police power and when it is not. It is sufficient to say, as heretofore stated, that if the instrumentalities in question are Federal agencies concerning which Congress and the President has exercised their powers in the control, possession, and operation of the same, the police power of the state does not obtain; otherwise it may.

In Pappens v. United States, 164 C. C. A. 167, 252 Fed. 55, the defendants were convicted of maintaining a house of ill fame within 5 miles of a military fort. Section 13 of the Act of May 18, 1917, chap. 15, authorized the Secretary of War to suppress, during the period of war, houses of ill fame within such distance from any fort or military camp, etc., as he deemed needful. The defendants contended that the violation of the 5-mile rule as established by the Secretary of War was an invasion of the police powers of the state. The contention was denied, the court holding that Congress, having acted under a constitutional power pursuant to its war powers, had full and plenary authority; and that, furthermore, the act was not a delegation of legislative power to an executive officer.

It is inconceivable that at a time when every resource and energy of the nation was absolutely necessary to be devoted to our Federal government in order to enable it to marshal every resource of man and property to carry on the war successfully, that the state, in the exercise of a so-termed police regulation, had the power or the authority to prescribe a rate that might obtain over a governmental controlled railway between two points in the state, or to assert, under its existing laws, what merchandise should be carried and when it should be transported, or that it should compel, under its existing laws, a particular service to passengers or to property that might be detrimental or contrary to the Federal demands. If this authority or power of the state did not exist at times when the war was at its height, it does not exist now, unless the emergency situation created by the act of Congress has, in fact, passed.

Even though, as contended, it be conceded that the exercise of the rate-making power of the state is a lawful police regulation of the state, and as such applicable under § 15 of said act, to intrastate traffic, nevertheless, such police regulations may well be considered, in view of his proclamation and the terms of the general order issued, disclosing and determining an emergency in war times to exist, to affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds.

Well might the regulatory power of the state concerning rates apply on intrastate traffic, if the President, pursuant to the powers granted to him, had deemed it unnecessary to initiate or prescribe a rate to apply to railroads under such Federal control.

The contention of the state that the provisions of § 10 of such act, which provides that actions may be instituted against the carriers affected by Federal control, and judgment rendered as theretofore provided by law, and that in any such action no defense may be made upon the ground that the carrier is an instrumentality or agency of the Federal government, show that such systems are not Federal instrumentalities, cannot be upheld. Well might this provision be construed to permit an action at law or in equity to be maintained as formerly without embarrassment to litigants by the defense of a governmental agency. The act itself and the control assumed show in fact a control by the government for war purposes, and an administration in fact through government revenues, an operation through government officials, and a rate-making power exercised through governmental authority. Clearly, upon the principles discussed herein, the powers of the state over rate making on intrastate traffic do not apply to the transportation line involved herein, if the act, and the purpose for which it was passed, are still effective.

6. *Whether the emergency for which the Congressional acts were enacted has passed and the powers conferred thereunder are now ineffective.* —The state contends that what Congress delegated as a war-time necessity has quite another aspect when that emergency has passed. That the war emergency has passed; that President Wilson in an official address on November 11, 1918, told Congress that the war was in fact concluded; that he then said: "The war thus comes to an end; for having accepted these terms of armistice, it will be impossible for the German command to renew it." That the war has in fact ended; that the armistice accepted by the central powers amounted to an unconditional surrender, and the necessity for government rail control as a war measure has passed away.

Upon the legal issues presented to this court and the showing made therefrom, we are convinced that this contention cannot be upheld; there is no showing made to this court that governmental operation is not still urgently needed in the demobilization of troops, the maintenance of the armistice terms, the transportation of government materials and supplies, and in the governmental problems involved in the establishment of peace and normal conditions following the actual cessation of hostilities.

The mere fact that an armistice has been declared does not in and of itself determine that the emergency war powers then being exercised pursuant to Congressional authority then cease. Congress, in the act, has prescribed a limitation of time, to wit; one year and nine months following the Treaty of Peace, for the exercise of this Federal control. It has recognized therein the necessity of emergency war legislation continuing for a period of time after the termination of the war. In such matters, its discretion, as well as that of the President, is a matter necessarily involved in the plenary war powers conferred upon them concerning which the judiciary will not interfere unless in fact it is demonstrated by proof subject to judicial inquiry, that the necessity for the exercise of such war powers does not exist.

In Stewart v. Kahn, 11 Wall. 493, 20 L. ed. 176, the court said: "The measures to be taken in carrying on war and to suppress insurrections are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution. In the latter case the power is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict and to remedy the evils which have arisen from its rise and progress."

It therefore follows that the petition of the relator herein should in all things be dismissed.